**Robert SCHANZER and Robert Madison, Plaintiffs,**

v.

**UNITED TECHNOLOGIES CORP., Pratt & Whitney Division, Defendant.**

**No. 3:98CV834 (JBA).**

United States District Court, D. Connecticut.

Sept. 29, 2000.

Gregg D. Adler, Peter D. Goselin, Henry F. Murray, Livingston, Adler, Pulda & Meiklejohn, Hartford, CT, for Plaintiffs.

Glenn William Dowd, Victoria Woodin Chavey, Elizabeth Ann Alquist, Robert J O'Hara, John P. McLafferty, Suzanne Garrow, Day, Berry & Howard, Hartford, CT, for Defendant.

Kathleen Eldergill, Beck & Eldergill, Manchester, CT, for Movant.

## MEMORANDUM OF DECISION

ARTERTON, District Judge.

### I. INTRODUCTION

Plaintiffs Robert Schanzer (Schanzer) and Robert Madison (Madison) charge that their former employer, Pratt & Whitney ("Pratt"), discriminated against them on the basis of their age when they were selected for layoff by means of a "paired comparison" ranking process that purported to measure, among other criteria, the individual's "future potential." The jury rendered a verdict in favor of the plaintiffs on their disparate treatment claims on February 1, 2000, and awarded $135,000 in economic loss to Schanzer and $130,000 in economic loss to Madison. The jury further awarded compensatory damages under the Connecticut Fair Employment Practices Act (FEPA) in the amount of $175,000 for each plaintiff, and found that the defendant's violation of the Age Discrimination in Employment Act was willful. *See* Doc. # 80 (Amended Judgment). Plaintiffs' disparate impact claim was tried to the bench, decision on which shall issue in a separate opinion. This memorandum of decision contains the final evidentiary ruling on the admissibility of plaintiffs' statistical evidence; and the Court's ruling on defendant's post-trial motions for judgment as a matter of law, for a new trial or, in the alternative, remittitur.

### II. Factual Background

The majority of the facts surrounding this employment case are discussed in context below. In brief, the plaintiffs were laid off from their positions as Project Financial Analysts at Pratt on March 19, 1997. At the time of his layoff, Mr. Madi-

son was 53 years old, and had worked for Pratt for almost 30 years. Test. of Madison at 175, 188. Mr. Schanzer was also 53 years old when he was terminated, and had worked for Pratt for almost 23 years. Test. of Schanzer at 52, 73–74.

Pratt was facing financial difficulties in late 1996 and early 1997, and decided on a layoff as a method of reducing costs. Leary Test. at 378. Sandy Paluba, Pratt's Manager of Human Resources Planning, worked with a number of human resources professionals to come up with a plan to implement the reductions. Paluba Test. at 413–15. Ultimately, defendant's vice presidents recommended to John Leary, Pratt's Vice–President of Human Resources and Organization that Pratt use a "paired comparison" process, in which every employee in a group would be compared head-to-head against each other employee, utilizing the following criteria: "diversity of skill set," "technical expertise," "leadership qualities," and "future potential." Puroshotaman Test. at 286. This last criterion, "future potential," had never been used before at Pratt, Tr. at 361, nor was it analyzed, through "benchmarking" or a "validation study," to test its effect or to determine whether its use would have an adverse impact on older workers. Leary Test. at 368–70. Randy Suida, the Vice–President and Chief Financial Officer of plaintiffs' division, described "future potential" as the one criteria which encapsulated the characteristics of the type of person the company wanted "going forward." Suida Test. at 852.

In choosing the four criteria, deciding on the process to select employees for layoff, and communicating these ideas to the business unit managers and human resources professionals who would be participating in the process, no one at Pratt compiled written notes, reports, memoranda, or other written explanations detailing how to conduct the paired comparison process or defining the four criteria which were to be used. Turgeon Test. at 621–25. Consequently, everything related to the paired comparison process, including the definition of the criterion "future potential," was communicated orally by HR Department personnel and subsequently by business unit managers. Paluba Test. at 421–26. During the "head to head comparison" for the employees in plaintiffs' Labor Grade, further details of which are outlined below, only Ms. Turgeon tallied the results of the individual comparisons; all other notes were collected and, since testimony disclosed that they no longer exist, they were presumably destroyed. Turgeon. Test. at 621; Paluba Test. at 424.

## III. Admissibility of Expert Testimony

The Court ruled on defendant's motion in limine to exclude plaintiffs' statistical evidence during pre-trial conference, but did not issue a final written ruling. The following is the Court's written decision on the admissibility of plaintiffs statistical expert evidence.

### A. Description of "Paired Comparison" Process

The "paired comparison" process by which plaintiffs were selected for layoff involved ranking all Financial Department employees according to the four criteria outlined above. Employees in plaintiffs' labor grade (48), a particularly large grade, were first rated into one of four groups based on these criteria and then compared with all other employees in the same ranking group (Groups 1, 2, 3 and 4). In the comparison process, employees were given a 1 if they "won" and a zero if they "lost" to the employee to whom they were being compared, from which a score was totaled and a final ranking established from which layoffs were made. Of the 168 employees in plaintiffs' labor grade, all but one of the fifteen highest-rated employees were under the age of 40, while 82 of the 97 lowest-ranked employees (Groups 3 and 4) were 40 or older. Fifteen employees were then selected for layoff from the lower group rating of 3 and 4 based on their "paired" comparative rankings. All

fifteen terminated employees in plaintiffs' Labor Grade (48) were 46 or older, while 32 of the 33 employees laid off in the Financial Department as a whole were 40 or older.

According to the Older Workers Benefit Protection Act data received by the plaintiffs on their day of termination, 29 U.S.C. § 626(f), 97% of the layoffs in the plaintiffs' department, and 100% of the layoffs within plaintiffs' particular labor grade, adversely impacted employees 40 or older. To determine whether these numbers had statistical significance, plaintiffs retained Dr. Adam Grossberg, Associate Professor of Economics at Trinity College in Hartford, to analyze both the results of the rating and paired ranking process as well as the resulting layoffs. In his analysis, Professor Grossberg employed the Fisher's Exact Test, a statistical method commonly used in employment discrimination cases. *See, e.g. Victory v. Hewlett–Packard Co.*, 34 F.Supp.2d 809 (E.D.N.Y.1999). In simple terms, the Fisher's Exact Test employed here measures the probability that the resulting distribution of the ages of the terminated employees would occur by random chance. *See* Grossberg Report, Def.Ex.A. The test assumes that there is no correlation between the employees' ages and whether they were terminated; if the assumption (the null hypothesis) is correct, the resulting data will demonstrate only a coincidental degree of association. If the null hypothesis is disproved by the layoff data, then the conclusion is reached that age did correlate with termination, other than by chance. The parties agree that the Fisher's Exact Test does not seek to measure the impact of other variables, such as performance or length of service, on the termination decision.[1] The difference between the results that one would expect to occur as a result of chance and the actual results are measured in "standard deviations." *See Smith v. Xerox*, 196

F.3d 358, 365 (2d Cir.1999) ("Basically, looking at standard deviations indicates how far an obtained result varies from an expected result.")

After conducting this analysis, Professor Grossberg concluded that both the employee ratings and the layoff decisions "were very significantly related to whether employees were 40 years-of-age or older at the time of the layoff." Grossberg Report at 2, Def.Ex.A. Defendant's motion in limine sought to exclude all testimony regarding this analysis by Professor Grossberg, on the grounds that Grossberg's failure to account for the possibility that other, nondiscriminatory factors might explain the results of the layoff and his use of the incorrect employee group rendered his analysis invalid and unreliable.

## B. DISCUSSION

Since the passage of the Civil Rights Act of 1964, courts have frequently relied upon statistical evidence to prove a violation of the employment discrimination laws. *See United States v. Ironworkers Local 86*, 443 F.2d 544 (9th Cir.1971) (citing cases). The Supreme Court has cautioned, however, that "statistics are not irrefutable; they come in infinite variety and, like any other kind of evidence, they may be rebutted. In short, their usefulness depends on all of the surrounding facts and circumstances." *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 339, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).

### 1. Failure to Conduct Regression Analysis

Defendant correctly observed that in determining the admissibility of this statistical evidence, the Court has the obligation to act as gatekeeper and exclude invalid and unreliable testimony. *Hollander v. American Cyanamid Co.*, 172

---

[1]. This summary of the logic involved is necessarily simplistic. For a more erudite explanation, see Judge Higginbotham's description in *Jurgens v. EEOC*, 1982 WL 409, \*11

(N.D.Tex.). *See also* Baldus, D. & Cole, J., Statistical Proof of Discrimination (McGraw Hill, 1980) (§ 9A.11–.12).

F.3d 192, 202 (2d Cir.1999); *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). According to Pratt, the Court should exercise its gatekeeping function to exclude Grossberg's analysis, because of his failure to conduct a multiple regression analysis. Such an analysis tests a variety of factors simultaneously to determine their effect on the employment decision. Pratt argued that Grossberg's failure to rule out the possibility that factors other than age, such as skill, education level and performance, account for the reported disparity, is fatal to the reliability and thus admissibility of his testimony. The Court disagreed.

Defendant cites to several recent Second Circuit cases for the proposition that statistical evidence which fails to account for non-discriminatory factors is properly excluded because it is not probative of discrimination. Defendant seeks to distill a general rule from very fact-specific cases, however, and a closer analysis demonstrated that these cases do not compel the result defendant urges the Court to reach.

The statistical report at issue in *Bickerstaff v. Vassar College,* 1999 U.S.App. LEXIS 29726 (1999), for instance, purported to analyze whether salaries at Vassar varied due to race or sex, yet failed to account for the precise variables that the college had utilized in reaching salary decisions. Vassar had determined faculty salaries on the basis of a scale which assigned a certain number of points for each of three criteria, for total points ranging from zero to eight. *Id.* In contrast, the selection process challenged here did not assign any quantitative value to any of four criteria used in the ranking, but instead utilized a process by which employees were given an initial numerical rating of one through four, and then ranked again within those rating groups to determine who "won out." While Professor Grossberg testified at his deposition that he would have liked to incorporate other independent variables into his calculations, such data simply was not available in any format that could be measured in his statistical analysis because, unlike Vassar, defendant had used no quantification of variables. In short, in seeking to model the process followed by defendant, no other variables could have been incorporated, as they were not measured in any quantifiable fashion in the challenged ranking process itself. As a result, plaintiffs argue, all that can be tested is the output of Pratt's decision making process. The Second Circuit determined that the report of the statistical expert in *Bickerstaff* had no probative value, because the analysis did not take into account the process followed by Vassar College, nor did it incorporate the variables utilized and quantified by the decision-makers. Such is not the case here.

*Smith v. Xerox,* 196 F.3d 358 (2d Cir. 1999), also does not require exclusion of the Grossberg data. There, the Second Circuit affirmed the district court's grant of summary judgment on plaintiffs' age disparate treatment claim. The statistical analysis at issue, like Professor Grossberg's report, tested the probability that the perceived difference in treatment of older employees was the result of chance, and did not control for other factors. Unlike the present situation, however, quantitative data existed as a result of the employer's process, as the employees in *Xerox Corp.* were rated on numerical, quantifiable criteria, data which could then be incorporated into a statistical analysis. As such variables were not accounted for by plaintiffs' expert in *Xerox Corp.,* the statistical methodology "could not, by itself, support a conclusion that discrimination must have been the cause for the disparity." 196 F.3d at 371, n. 11. Here, the only "data" utilized in the selection process—the ranking of employees from 1 to 4 based on four unquantified, grouped criteria including "future potential."—is charged by plaintiffs to be discriminatory in itself. Had this "data" been used in Professor Grossberg's analysis as a quantifiable variable, it would have rendered the results suspect because, as was

noted in *Xerox Corp.*, "tainted variables do not further the causation inquiry." *See id.* at 371, n. 11.

The Court agrees with plaintiffs that *Raskin v. Wyatt Co.*, 125 F.3d 55, 67 (2d Cir.1997) is simply inapplicable. There, the plaintiffs' expert purported to test the retirement rate at defendant against the "general population" of older workers, but failed to account for numerous differences between the groups compared. Here, the statistical analysis compared a group of employees within the same division, employed by the same employer. *Raskin* thus provides little guidance for the present case.

In its gatekeeping function prior to trial, the Court concluded that applicable law does not mandate the use of a multiple regression analysis in every case in which statistical evidence forms some part of the proof, particularly where the variables that would be incorporated into such a regression analysis were not measured in any quantifiable fashion in the original decision by the employer.

### 2. Professor Grossberg's Regression Analysis

■ Plaintiffs submitted an additional analysis conducted by Professor Grossberg in response to defendant's motion in limine as further support for their argument that Grossberg's statistical analysis both meets the expert testimony requirements and is sufficiently probative to be helpful to the jury in ascertaining whether or not age played an impermissible role in Pratt's selection process. As an initial matter, this Court first considered the timing of this second analysis. The analysis, conducted on January 5, 2000, was clearly not timely under the scheduling order, which mandated expert disclosure by plaintiffs by May 30, 1999. Professor Grossberg's deposition was completed on December 8, 1999, and trial was set to begin on January 24, 2000. The Court is also aware that

defendant's expert deposition was not taken until Professor Grossberg's was completed. Federal Rule of Civil Procedure 37(c)(1) prevents a party from "using as evidence any witnesses or information that, without substantial justification, has not been disclosed" in accordance with the time lines set out in the rules and by order of the Court. Fed.R.Civ.P. 37(c)(1), Advisory Committee Notes to 1993 Amendments. The prejudice to defendant of allowing this late-disclosed testimony at trial is apparent, as they would have been forced to conduct an additional, last-minute deposition of Dr. Grossberg and review his supplementary findings with their own expert, all within a very narrow window of time. As plaintiffs had not demonstrated a "substantial justification" for the belated supplementary report other than as a response to defendant's motion in limine that would counterbalance the resulting prejudice to the defendant, plaintiffs were not permitted to offer the opinions contained in that report in their case-in-chief.

The Court concluded, however, that Grossberg's supplementary findings may be considered in determining the admissibility of Professor Grossberg's initial report.[2] Exclusion under Rule 37(c)(1) is a form of a sanction, designed to encourage compliance with the disclosure requirements of the Rules and the Court. There was no indication that the late disclosure here was the result of any bad faith or dilatory tactics, but was instead prompted by defendant's motion in limine to exclude Professor Grossberg's testimony in its entirety. This was not a case of "sandbagging" an adversary at trial with newly disclosed evidence, nor did considering the supplementary information defeat the purposes of Rule 37. *See* 7 James Wm. Moore, et al. Moore's Federal Practice, § 37.60[1] (1999).

The Court concluded that the additional analysis further demonstrated the reliability and probative value of Professor Gross-

---

**2.** Rule 37(c)(1) applies to motion practice as well, in that it prohibits the "use" of the late-

disclosed evidence "at a trial, at a hearing, or on a motion . . . ." Fed.R.Civ.P. 37(c)(1).

berg's initial report. Professor Grossberg conducted a regression analysis to test the relationship between employees' most recent performance rating, their ages, and whether they were selected for layoff. He concluded that employee performance ratings were not significantly related to age or to the layoff decision, but that even controlling for prior performance ratings, employees over 40 were more likely to be ranked at 3 or 4 and more likely to be selected for lay off than their younger co-workers. Pl.Ex. E at 4.

Although a multiple-regression analysis is not mandated in every employment discrimination case utilizing a statistical expert, Professor Grossberg's second analysis addressed what defendant had identified as an indicator of unreliability of his opinion in his first report. Having determined reliability, this Court is also persuaded that Grossberg's testimony regarding his statistical analysis will been helpful to the jurors in their determination of the role, if any, that age played in the challenged process. Accordingly, defendant's motion to exclude this evidence on *Kumho* grounds was DENIED.

### 3. Relevant Group of Employees

Defendant's next argument, that Grossberg failed to analyze the relevant group of employees, posited that plaintiffs should only have considered those employees ranked at 3 or 4 in the rating process. This argument is meritless, as the Second Circuit has specifically cautioned against allowing the manipulation of statistical data through selective grouping of employees, and instead recommends that *all* employees subject to the process be included in the statistical analysis. *Xerox Corp.*, 196 F.3d at 369. Further, plaintiffs seek to demonstrate discrimination in the ranking process itself, which allegedly resulted in older employees being clustered in the lowest ranked groups, 3 and 4, and directly vulnerable to layoff. Plaintiffs correctly analogize defendant's position to the "bottom line" statistical argument rejected in *Connecticut v. Teal*, 457 U.S. 440, 102

S.Ct. 2525, 73 L.Ed.2d 130 (1982). Allowing defendant to limit the relevant employee group to those ranked as 3's or 4's would effectively immunize the ranking process itself from review, a result at odds with *Teal*. Defendant's motion on these grounds was therefore DENIED.

### 4. Relevance

Finally, defendant argued that under Rule 403 any probative value of Grossberg's testimony is substantially outweighed by its unduly prejudicial effect. This argument is predicated on defendant's primary argument that the statistical analysis conducted by Grossberg is not probative on the question of whether age-based bias infected the decision-making process, an argument this Court has rejected. Defendant's motion to exclude the statistical evidence on Rule 403 relevance grounds was therefore DENIED.

### C. Conclusion

For the reasons stated above, Defendant's Motion in Limine to Exclude Statistical Evidence [doc. # 42] was DENIED. The Court accordingly considers this evidence in deciding defendant's post-trial motions.

## IV. Motions for Judgment as a Matter of Law, New Trial or in the Alternative, Remittitur

### A. Standard

██ On a motion for judgment as a matter of law pursuant to Rule 50(b), a district court may grant a motion for judgment as a matter of law only if:

> there exists "such complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture," or the evidence in favor of the movant is so overwhelming "that reasonable and fair minded [persons] could not arrive at a verdict against [it]."

*Luciano v. The Olsten Corp.*, 110 F.3d 210, 214 (2d Cir.1997) (*quoting Cruz v. Local*

*Union No. 3,* 34 F.3d 1148, 1154 (2d Cir. 1994)). "Judgment n.o.v. is proper 'only if the evidence viewed in the light most favorable to the non-movants, without considering credibility or weight, reasonably permits only a conclusion in the movant's favor.'" *Doctor's Assoc., Inc. v. Weible,* 92 F.3d 108, 112 (2d Cir.1996) (*quoting Baskin v. Hawley,* 807 F.2d 1120, 1129 (2d Cir.1986)).

■ As for defendant's motion for a new trial, Rule 59(a) of the Federal Rules of Civil Procedure provides: "A new trial may be granted . . . for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." As a general matter, "[a] motion for a new trial should be granted when, in the opinion of the district court, the jury has reached a seriously erroneous result or . . . the verdict is a miscarriage of justice." *Song v. Ives Labs., Inc.,* 957 F.2d 1041, 1047 (2d Cir. 1992) (quotation marks and citation omitted). A new trial may be granted, therefore, when the jury's verdict is against the weight of the evidence. *See Byrd v. Blue Ridge Rural Elec. Co-op.,* 356 U.S. 525, 550, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958); *see also Dunlap–McCuller v. Riese Organization,* 980 F.2d 153, 157 (2d Cir.1992); *Metromedia Co. v. Fugazy,* 983 F.2d 350, 363 (2d Cir.1992).

■ The standards governing a court's consideration of a Rule 59 motion for a new trial on the grounds that the verdict was against the weight of the evidence differ in two significant ways from the standards outlined above governing a Rule 50 motion for judgment as a matter of law. Unlike judgment as a matter of law, a new trial may be granted even if there is substantial evidence supporting the jury's verdict. *DLC Management v. Town of Hyde Park,* 163 F.3d 124 (2d Cir.1998). Moreover, a trial judge is free to weigh the evidence herself, and need not view it in the light most favorable to the verdict winner. *See Song,* 957 F.2d at 1047. A court considering a Rule 59 mo-

tion for a new trial must bear in mind, however, that such a motion should only be granted when the jury's verdict is "egregious." *Dunlap–McCuller,* 980 F.2d at 158. Accordingly, a court should rarely disturb a jury's evaluation of a witness's credibility. *Id.; Fugazy,* 983 F.2d at 363.

■ "It is well-settled that Rule 59 is not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a 'second bite at the apple' . . ." *Sequa Corp. v. GBJ Corp.,* 156 F.3d 136, 144 (2d Cir.1998). "A court considering a Rule 59 motion for a new trial must bear in mind, however, that the court should only grant a motion when the jury's verdict is 'egregious.'" *DLC Management Corp.,* 163 F.3d at 134.

### B. Motion for Judgment as a Matter of Law

#### i) Jury Finding of Discrimination

■ After a full trial on the merits, the sequential burden-shifting framework of *McDonnell Douglas* and its progeny drops out of the picture, and the Court is left with the ultimate question of whether the plaintiffs have met their burden of proving that the adverse employment action complained of was motivated, at least in part, by prohibited discrimination. *See Fields v. New York State Office of Mental Retardation,* 115 F.3d 116, 119 (2nd Cir.1997). The "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves v. Sanderson Plumbing,* 530 U.S. 133, 120 S.Ct. 2097, 2106, 147 L.Ed.2d 105 (2000).

Defendant claims that this is a disparate impact case masquerading as a disparate treatment case, because no individualized intentional discrimination has been shown. It argues that the jury could not have reasonably and legally found for the plaintiffs, because the evidence here allows for only one reasonable conclusion: that de-

fendant did not discriminate based on the plaintiffs' ages when they were ranked and then selected for layoff through the paired comparison process. Defendant categorizes the myriad of cases involving the quantum of evidence necessary to demonstrate intentional discrimination into three different groupings: age-related remarks, more favorable treatment of similarly-situated younger employees, and cases involving valid and probative statistics. Because this case does not involve the former two methods, and because statistics alone cannot support an inference of discrimination on a claim of individualized disparate treatment, defendant argues, the verdict in plaintiffs' favor should be reversed. Defendant points to the unanimous agreement of the executives participating in the paired comparison process that the plaintiffs should be ranked at the bottom of Labor Grade 48, and the lack of any evidence from which the jury could have inferred that these decision-makers were lying when they categorically denied that age had played any role in their decision.

Defendant cites *Hollander v. American Cyanamid Co.*, 172 F.3d 192, 202 (2d Cir. 1999) in support of its position that statistical evidence regarding the layoff cannot alone support an inference of individualized disparate treatment. That case, however, is distinguishable. *Hollander* involved a plaintiff terminated due to performance problems, not a reduction-in-force achieved through a ranking process including the use of "future potential" as a criterion. The statistics in *Hollander* were excluded by the district court due to the trial judge's perception that the two different reports were statistically flawed, and thus not probative of age discrimination. 172 F.3d at 203. The statistical evidence analyzed terminations over lengthy periods of time, failed to account for voluntary terminations and the like, and gerrymandered the age groupings and time periods in order to reach a result favorable to the plaintiff. *Id.*

In contrast, the Court has already determined that Professor Grossberg's analysis was admissible as probative on the issue of age discrimination. Although defendant attacked his report as failing to account for "other causes," in the present case the "paired comparison" itself process used no other quantifiable data that could have been incorporated into an analysis, and in fact according to the testimony explicitly did not look to data such as performance reviews and merit increases. As such Grossberg's analysis modeled the defendant's process. As distinguished from *Hollander*, this case involves a one-time layoff, where all fifteen employees terminated in Labor Grade 48 were over the age 46, and 32 of the 33 terminated employees in the Finance Department as a whole were over 40. All of these terminations were the result of the paired comparison layoff, rather than any other causes, and Grossberg's statistics were not "gerrymandered" to impermissibly skew the data in plaintiffs' favor. *Id.* While Professor Grossberg acknowledged that statistics could not definitively state whether the plaintiffs were individually discriminated against, he stressed that his report showed that age was a statistically significant factor in both the initial groupings and the termination decision. "A statistical showing of discrimination rests on the inherent improbability that the institution's decisions would conform to the observed pattern unless intentional discrimination was present." *Pollis v. New School for Social Research*, 132 F.3d 115, 121 (2d Cir.1997). Professor Grossberg's analysis provided precisely that.

The Court also disagrees with Pratt's argument that this is actually a disparate impact claim masquerading as a disparate treatment claim. According to defendant, the absence of any evidence of discriminatory remarks in the implementation of the paired comparison process or direct age bias on the part of the decision-makers renders the layoff impervious to claims of intentional discrimination, despite the skewed results and the use of "future po-

tential" as a criterion. By sealing off the process and obliterating any paper trail, defendant claims that it has insulated its decision-making from further review, because no direct evidence of intentional discrimination has been disclosed. The statistical evidence, however, seeks to model the process defendant used, and thereby open up that process to scrutiny by showing the improbability that the resulting age imbalance occurred by chance. If Pratt were to succeed in this argument, it would, by utilizing this highly unusual process that employed no written instructions or criterion and lacked any documentation, effectively deprive plaintiffs of an opportunity to show that the process was age-biased. On the unique facts of this case, the Court concludes that the statistical evidence here is probative of intentional discrimination.

Contrary to defendant's argument, however, plaintiffs do not rely on statistics alone to establish disparate treatment on the basis of age. In particular, plaintiffs relied on the criterion "future potential," and argued that the use of this factor allowed an impermissible age bias to taint the "paired comparison" process. Defendant points to language in the Congressional Statement of Findings and Purpose for the ADEA citing the "setting of arbitrary age limits regardless of potential for job performance" as one reason for enacting the statute. 29 U.S.C. § 621(a)(1). The Court does not dispute that employers may certainly consider potential for job performance when making termination decisions without violating the ADEA, but that is not the gravamen of plaintiffs' complaint here. Rather, plaintiffs argue that as evidenced by the results of the paired comparison process, "future potential," indicated by Suida to be the most important factor of the four, became a proxy for age in evaluating the plaintiffs.

Defendant points to a number of cases rejecting arguments that the use of "future potential" or similar criteria is suggestive of age discrimination, but these cases are readily distinguishable. In *Brocklehurst v. PPG Indus.*, 123 F.3d 890, 896 (6th Cir. 1997), one of the decision-makers commented that the plaintiff had less potential than the individual who was retained. The Sixth Circuit noted that "[a]n employee can reach the end of his or her potential at any age," and concluded that this statement was not probative of age discrimination. *Id.* In the present case, the Court is not faced with a single statement made to an individual plaintiff; rather, the procedure for an entire layoff included "potential" as an express, unquantified criterion, and the jury was entitled to infer from the statistical disparities that the modifier of "future" correlated to age.

*Morser v. AT & T Info. Sys.*, 703 F.Supp. 1072 (S.D.N.Y.1989) is also dissimilar. AT & T conducted a massive layoff over a two-year period and included "future potential" and "potential" among the over 15 criteria that were used. Despite the use of these terms, the district court concluded that age bias did not "infect" the layoff, due to the procedures established by AT & T to monitor the downsizing effort and to ensure that the layoffs did not disparately impact older workers. The statistical evidence there demonstrated that the layoff had had no impact on the average or median age of plaintiff's organization, which the court concluded was the result of the defendant's efforts to ensure the fair operation of the reduction. Defendant here has no evidence of such efforts on its part—in fact, it appears that the results of the layoff were not analyzed, nor was the use of "future potential" ever assessed for its possible impact on older workers.

*Doan v. Seagate Tech., Inc.*, 82 F.3d 974 (10th Cir.1996) and *Furr v. Seagate Tech., Inc.*, 82 F.3d 980, 986 (10th Cir.1996) both arose out of the same layoff in which "potential" was used as a selection criterion, along with performance and seniority. The plaintiffs argued that "potential" was a subjective criteria, and that its use adversely affected older employees. The

same panel of the Tenth Circuit rejected the argument in both cases, noting that subjective criteria does not suffice to create intentional discrimination and that "[f]uture job potential is certainly something that a company might legitimately want to consider in its RIF decision." *Furr*, 82 F.3d at 987; *Doan*, 82 F.3d at 978.

This Court is not bound by the rulings of the Tenth Circuit, and notes several significant differences between the facts in the *Seagate* cases and here. First, the "seniority" factor used there, while not necessarily correlated with age, does provide some counterbalancing weight to any impermissible taint that may have flowed from using "future potential." None of the other criteria used here could be considered to have any such balancing effect. Second, individual managers of the plaintiffs in *Seagate* made the layoff decisions pursuant to the criteria, as compared to this case where a group of executives, a number of whom were relatively unacquainted with the skills and performance of Schanzer and Madison, made very quick determinations regarding all the layoffs. In such a situation, it would be more reasonable to infer that age bias could sneak into the deliberations, as compared to the situation where the supervisors of individual plaintiffs made individual determinations regarding their direct reports' strengths and weaknesses. Finally, in *Furr*, the various managers who made the decisions regarding the plaintiffs testified that they looked only to whether the plaintiffs' jobs could be eliminated and the plaintiffs' performance in making the selection; "potential" did not enter into their deliberations. 82 F.3d at 987. In contrast, here "future potential" seemed to be the overarching evaluative criteria in a comprehensive selection process leading to a layoff, the age-based results of which could not be explained by chance. On this evidence, a jury could have concluded that "future potential" served as a surrogate for age, or at least was the vehicle by which impermissible age bias entered into the process.[3]

Aside from the statistical evidence and the use of "future potential" as a criteria, plaintiffs presented additional evidence at trial that would have allowed the jury to infer that age was a motivating factor in the decision to terminate Mr. Schanzer and Mr. Madison. The initial ranking, by which plaintiffs were categorized as 3/4's, resulted in a starkly unequal distribution of older employees, with the average age of the top one-third equaling 32 and the average age of the bottom one-third equaling 47. Pl.Ex. 30. The eighteen new employees hired in the fifteen months prior to the paired comparison process had an average age of 33; several were exempted from the ranking and paired comparison process because they were too new, and none of the 18 new hires were laid off in March of 1997. P.Ex. 28.

Further, there was evidence from which the jury could have concluded that the defendant's reasons for the layoff and its explanation of the process were pretexts for discrimination. "Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional dis-

**3.** After the trial in this matter was completed, the Seventh Circuit decided *Thorn v. Sundstrand*, 207 F.3d 383 (7th Cir.2000), in which Judge Posner concluded that "neither in semantics nor in economics is having 'longest-term potential' a synonym for being youngest." *Id.* at 398. He observed that in making reduction-in-force decisions an employer is entitled to consider which employees are likely to contribute the most to the company "over the long haul," citing the *Seagate* cases and *Brocklehurst* in support of the proposi-

tion. Because younger employees tend to be more mobile than older ones, Posner opined without any citation, "there is no basis for an inference that employers interested in the long-term potential of an employee prefer young to old." While this Court is similarly not bound by the holdings of the Seventh Circuit, and while several factual matters distinguish *Thorn* from this case, this Court respectfully disagrees with Judge Posner's sweeping premise that "longest-term potential" is always an age-neutral factor.

crimination, and it may be quite persuasive." *Reeves*, 530 U.S. 133, 120 S.Ct. 2097, 2108, 147 L.Ed.2d 105 (2000). On redirect examination, after defendant faulted Professor Grossberg on cross-examination for failing to conduct a regression analysis, the plaintiffs were allowed to present his second analysis, which they had been precluded from using in their case in chief. According to this analysis, the final performance evaluations prior to the layoffs were not correlated to age, and since three of the qualities measured in the performance evaluations are similar to three of the criteria followed in the paired comparison process (skills, technical expertise and leadership qualities), the jury could have concluded that the resulting age discrepancy was due to the insertion of the "future potential" criteria, not plaintiffs' relative achievements on the other three factors.

More importantly, there was sufficient evidence for the jury to conclude that the actual head-to-head paired comparisons did not occur the way Turgeon and Suida described them. Turgeon estimated that the actual process took a total of six and a half hours, over the course of three different days. As plaintiffs point out, if the 168 Labor Grade 48 employees in the Finance Department were subject to this head-to-head comparison in the six and a half hour period allotted, each discussion and evaluation had to be accomplished in less than five seconds. *See* Pl.Mem. in Opp. at 31 (utilizing correct factorial equation of (n $\times$ (n $-$ 1)/2) to determine number of comparisons within each grouping). Given that defendant's witnesses insisted a "slow and deliberate", comparison had taken place, with only those individuals acquainted with the employees in question participating in each comparison, a reasonable jury could have disbelieved defendant's explanation of how the process was implemented and the witness' claims that age was not considered. "In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Reeves*, 120 S.Ct. at 2108.

The evidence tending to undermine defendant's explanation of its actions, combined with the force of the statistical analysis showing that the results of the initial ranking would happen by chance only one time in a billion and the layoff results one time in 2,000, and the disconnect between the paired comparison results and past performance reviews, was sufficient to allow a reasonable jury to conclude that more likely than not, age played a motivating role in the ranking and termination decisions. Accordingly, the jury's verdict on the disparate treatment claim will be upheld.

### ii) Jury Finding of Wilful ADEA Violation

■■ Defendant also argues that the plaintiffs have failed as a matter of law to present evidence of the wilfulness component of their disparate treatment claim. Conduct is deemed a wilful violation of the ADEA only if a plaintiff demonstrates that the employer acted in reckless disregard for whether its conduct was prohibited by the statute. *See Benjamin v. United Merchants and Mfgs.*, 873 F.2d 41, 43 (2d Cir.1989). Where there is sufficient evidence to support a finding of wilfulness, however, courts will generally not disturb a jury's finding to that effect. *See, e.g. McGinty v. State of New York*, 193 F.3d 64, 69 (2d Cir.1999).

■■ The basis for the jury's award of wilfulness, plaintiffs argue, was the evidence that the defendant prepared no written descriptions of the process or the criteria, collected and then destroyed all notes recording the deliberations of the paired comparison, did no testing or benchmarking of the "future potential" criteria, and then did no impact analysis in the face of results showing that 32 of the 33 terminated employees were over 46. Defendant asserts that such evidence can never be the basis for a finding of wilfulness, because it imposes a standard of human re-

sources practices on the employer which the statute never intended.

Defendant's argument in this regard can be addressed quite summarily. It was not the failure to do the things on plaintiffs' itemized list of "best practices" that resulted in the jury's conclusion. Rather, the jury looked beneath these facts to infer the motivation of a large and sophisticated corporation well-schooled in conducting layoffs. Plaintiffs charge the defendant with behaving like an ostrich—by burying its head in the sand and refusing to own up to the results of the process it had adopted. *See McGinty,* 193 F.3d at 69. At the least, the evidence supported a finding of "reckless disregard" in the present case. At the most, the jury could have inferred from defendant's efforts at obliterating any paper trail, a purposeful attempt to avoid the requirements of the law by insulating the decision-making process and deflecting the responsibility from any one individual. Under either circumstance, the finding of wilfulness was reasonable, and will not be disturbed by this Court.

*C. Motion for a New Trial or Remittitur*

Defendant seeks a new trial on the grounds that two of the Court's evidentiary rulings at trial were so erroneous that they denied defendant a right to a fair trial. In the alternative, defendant argues that the compensatory damages awarded by the jury were unsupported by the evidence and should be reduced.

1) Admission of Hiring Data (Plaintiffs' Exhibit 28)

 The first evidentiary ruling of this Court challenged by defendant involves plaintiffs' Exhibit 28, provided by defendant during discovery, which is a listing of all individuals hired into Labor Grade 48 classifications between January 1, 1996 and July 1, 1998, approximately fourteen months before and after the March 19, 1997 layoff. The exhibit includes names, job title, date of birth and date of hire. From this list, the jury could have deter-

mined that 18 people were hired in 1996, before the layoff, 18 additional people were hired in the year following the layoff, and that the average age of the new hires at the time of the layoff was 34. Defendant argues that this evidence was not relevant to plaintiffs' discriminatory termination claim, and that any minimal probative value is substantially outweighed by the prejudice to defendant.

The Court disagrees that Exhibit 28 is not relevant to the issues in the case. In numerous cases in this circuit, courts have considered the ages of new hires as part of the conglomeration of factors in age discrimination cases, primarily on the issue of pretext, and it was on these grounds that the Court admitted the document. *See Stratton v. Department of Aging, City of New York,* 132 F.3d 869 (2d Cir.1997) (evidence that younger employees were hired before and after plaintiff's termination could support an inference of pretext, given that the asserted reason for the layoff had been the need to cut costs); *Kirschner,* 973 F.2d at 92 (evidence that employer "manipulated the civil service system in order to favor new hires could support finding of age bias, reversing grant of jnov"); *see also Gibson v. American Broadcasting Cos.,* 892 F.2d 1128, 1132 (2d Cir.1989) (announcing rule that "comparative proof is generally admissible in a Title VII discrimination suit."); *Rose v. James River Paper Co.,* 2 F.Supp.2d 245, 251 (D.Conn.1998) (looking to evidence that younger employee with significant performance problems was retained in determining that plaintiff had made out his prima facie case in age discrimination case). While these Second Circuit cases do not expressly address the admissibility of such evidence, the Seventh Circuit has held that evidence of the identities and ages of employees hired at the same time that defendant was allegedly a pursuing reduction in force was relevant to plaintiff's claims that no reduction occurred and that age was the true reason for his discharge. *Pierce v. Atchison, Topeka and*

*Santa Fe Railway,* 65 F.3d 562, 572 (7th Cir.1995).

The cases cited by defendant are not to the contrary, in that they address the weight of such evidence, not its admissibility. The court in *Haskell v. Kaman Corp.,* 743 F.2d 113, 119 (2d Cir.1984) simply discussed general principles regarding the use of statistics in discrimination cases alleging failures to promote, noting that statistics may be undermined by considerations such as small sample size, and observing that "evidence showing that the figures for the general population might not accurately reflect the pool of qualified applicants would also be relevant." *Id.* Accordingly, as Exhibit 28 was introduced at the close of plaintiffs' case-in-chief, defendant could have introduced evidence showing the age of the applicant pool from which the new hires were drawn. *See Haskell.* Pratt's failure to do so can hardly be laid at plaintiffs' feet now, in terms of the foundation that was laid for its admission.

The Court also does not accept defendant's argument that it was unfairly prejudiced by this document's admission. While Pratt's case was perhaps harmed by the information summarized in Exhibit 28, given the asserted financial justifications for the layoff and the ages of the new hires listed, defendant has failed to articulate how it suffered "extreme prejudice" from its admission, other than the possible detriment caused to its case by the probative value of the list in its own right. *See United States v. Tice,* 133 F.3d 908, 1998 WL 29819, *1 (2nd Cir.(N.Y.) (where prejudicial nature of evidence stemmed directly from its probative value, district court did not abuse discretion in admitting evidence). Defendant contends that the fact the jury found intentional discrimination and wilfulness "goes far to prove the severe prejudice caused by the hiring evidence," but as the Court's ruling on the motion for judgment as a matter of law outlines, there was sufficient evidence to support the jury's verdict even absent the

hiring data contained in Exhibit 28. While defendant is correct that Exhibit 28 was emphasized by plaintiffs' counsel in closing arguments, and that such use of evidence can serve as a barometer of the evidence's importance, *see Hynes v. Coughlin,* 79 F.3d 285, 291 (2d Cir.1996), in the Court's view the remaining evidence was more than adequate to support the jury's verdict.

### 2) Admissibility of Lonergan Deposition Testimony

Defendant also sees error warranting a new trial in the Court's denial of its request to admit a complete deposition answer by a key company witness. Michael Lonergan, a financial manager who had supervised both Schanzer and Madison and participated in the paired comparison process for Labor Grade 48, was asked on cross-examination whether he spoke highly of Mr. Madison at the ranking meeting; Mr. Lonergan responded "Yes, I did." Tr. at 729–730. Later in the cross-examination, counsel referred the witness to a portion of his deposition testimony in which Lonergan had stated that he had spoken highly of Mr. Madison during the ranking meeting, and Mr. Lonergan confirmed that he had indeed testified to that effect at his deposition. Although defendant had not objected to the question or to referring the witness to his deposition testimony, after the question was asked and answered counsel for the defendant sought to have the remainder of Mr. Lonergan's deposition testimony answer read into the record. The Court directed him to do so on re-direct. Tr. at 733. Mr. Lonergan also testified during cross-examination that Mr. Madison was a good employee, but that "he didn't score as well as other individuals" in the ranking process. On re-direct, defendant sought to read the entirety of Mr. Lonergan's answer when questioned at his deposition regarding whether he had spoken highly of Madison at the ranking meeting; defense counsel was able to read the following:

I spoke highly of Bob in the capacity he performed when he was working for me. I thought Bob did good job, "good," quote, unquote, being defined as very conscientious, very timely work. So pretty much the things we discussed earlier with regard to his work ethic. The put (sic) from—

Counsel for plaintiffs then interposed an objection, claiming that the remainder of Lonergan's deposition answer was hearsay. Tr. at 736.

At sidebar, defense counsel argued that the remainder of the answer, which referred to the opinions of the other executives at the ranking meeting, was not hearsay, since it was only introduced for the effect that it had on Mr. Lonergan, not for the truth of the matter stated, and that omitting the rest of the testimony would leave the jury with the impression that Mr. Lonergan was changing his testimony. The Court concluded that defendant's objectives could be accomplished through redirect examination, that reading the entire deposition answer would be confusing to the jury and unnecessary, and that an instruction could dispel any misunderstanding on the part of the jury that Mr. Lonergan was changing his testimony at trial. Tr. 740–42.[4]

At the conclusion of the sidebar conference, the Court instructed the jury that:

I have explained to you, ladies and gentlemen, what a deposition was, and there are instances of questions, just as you heard attorneys object to questions here, there are problems with the questions or certain aspects of the answers, and I am making a ruling on those that will simply limit the portion of the readback of this deposition, since the deposition isn't evidence, and I am going to permit Mr. Zakarian to further inquire of Mr. Lonergan with respect to the meeting in which he participated in the evaluation of Mr. Madison.

Tr. at 743. On re-direct, counsel for defendant elicited that Mr. Lonergan had listened to the opinions of other executives in the meeting regarding Mr. Madison, and had considered those opinions before reaching consensus with the group as to his ranking. Tr. at 744. According to Lonergan, he received input from other managers during the ranking meeting that:

when it came to ranking against other employees [Madison's] technical skills, for example, general accounting skills, skills that would be useful, for example, in the Eagle Services organization which was growing with regard to acquiring subsidiaries, those types of skills weren't as strong.... Bob was not perceived to have the same level of computer skills, in particular when it came to mainframe applications that were specific to the Eagle Services organization. So when it came to skills such as technical skills and some other criteria, Bob did not rank as well as some of the other employees, such as his communication skills, in getting along and getting his point across and communicating with

---

4. Defendant had the entire portion of Lonergan's deposition transcript marked as Court Exhibit A, and the complete question and answer by Lonergan at his deposition are as follows:

Q: One thing I didn't ask you about is what did you say about Mr. Madison at this meeting?
A: I spoke highly of Bob in the capacity he performed when he was working for me. I thought Bob did a good job; "good" being defined as very conscientious, very timely work. So pretty much the things we discussed earlier with regard to his work ethic.

The put (sic) from other managers, however, was, "Yeah, but Bob doesn't have the same level of skills and/or experience, primarily in the accounting arena." In trying to be more definitive on that: General accounting nuts and bolts, debits and credits, foreign exchange and this and that, that the Eagle Services organization was getting more involved in. He didn't have the experience in financial consolidations, intercompany profit eliminations; stuff that was becoming more and more of a priority in that organization, that some of the other financial managers had.

Court Exhibit A, Lonergan Dep. at 111.

other financial members of the community, he did not rank as well as other employees there.

Tr. at 745.

■ Defendant argues that the excluded portion of Lonergan's deposition testimony was not hearsay, because it was not offered for the truth of the matter stated, but rather to show that the statements were made to Madison's supervisor and their effect on his state of mind in concurring with the decision of the group to rank Madison low in relation to the other Grade 48 employees. The Court agrees with the general principle of law articulated by defendant: that statements offered for their effect on the listener are non-hearsay. *See United States v. Puzzo*, 928 F.2d 1356, 1365 (2d Cir.1991). From the context of the deposition testimony, quoted in full above, it is not clear that Mr. Lonergan was explaining the effect that the other manager's opinions had on his state of mind; rather, he purports to relay what other managers said during the meeting, without any indication that he considered those opinions in making up his own mind about the ultimate ranking for Mr. Madison. In contrast, his trial testimony elaborates upon the connection between the opinions of the other managers and his eventual agreement with the ranking they assigned to Mr. Madison.

■ Even if the Court were persuaded that Lonergan's deposition testimony was not a recitation of what others had said at the meeting, but was instead non-hearsay that should have been admitted pursuant to Federal Rule of Civil Procedure 34(a)(4), the Court fails to discern how the jury was so seriously misled by its exclusion that a new trial was warranted. Defendant claims that the exclusion of the entire deposition answer left the jury with the impression that Mr. Lonergan had answered the question regarding his input at the paired comparison meeting one way in his deposition, but was answering the question another way at trial, and that the jury would therefore think he was being untruthful on the stand. The Court cannot agree with such a tortured reading of the trial transcript.

At trial, Mr. Lonergan testified without objection that he had considered the opinions of the other managers at the meetings and relied upon them in coming to the consensus that Mr. Madison should he ranked low; his testimony at trial in this regard was very similar to the excluded portion of the deposition testimony. Counsel for plaintiffs did not imply that Mr. Lonergan had changed his testimony in any way, and in closing argument he simply reminded the jury that Lonergan testified that he thought Mr. Madison was "a dedicated, conscientious, good employee." Tr. at 1027. There was no reference to Lonergan's participation in the meeting, nor was there any insinuation that Lonergan was not to be believed when he testified regarding how other individuals at the paired comparison meeting assessed Mr. Madison. From the Court's reading of the transcript, it is farfetched to suggest that the limited deposition testimony read into the record somehow indicated to the jury that Lonergan's trial testimony regarding the opinions of the other managers was a recent fabrication.

The Court adheres to its decisions at trial regarding the hiring data and Lonergan's deposition testimony. Further, the Court concludes that even if the two challenged evidentiary rulings were in error, the error was harmless, as the defendant was not prejudiced. Accordingly, defendant's motion for a new trial is DENIED.

### 3) Remittitur

Finally, defendant argues that the jury's award of $175,000 in compensatory damages to each plaintiff is excessive, and should be set aside or reduced as a matter of fact and law. Remittitur is the process by which a plaintiff must choose between a reduction of an excessive verdict or a new trial. *Shu–Tao Lin v. McDonnell Douglas Corp.*, 742 F.2d 45, 49 (2d Cir.1984). Be-

cause plaintiffs were awarded compensatory damages under their CFEPA state law claims, defendant's motion is governed by Connecticut's substantive law, in terms of assessing the evidence of emotional distress to determine whether it is adequate to support the verdict. *See Gagne v. Town of Enfield,* 734 F.2d 902, 905 (2d Cir.1984). In Connecticut, the Court is required to view plaintiff's evidence in support of his claim for compensatory damages due to emotional distress in the light most favorable to the plaintiff, in determining whether the verdict returned was reasonably supported thereby. *See Oakes v. New England Dairies,* 219 Conn. 1, 591 A.2d 1261 (1991). "The size of the verdict alone does not determine whether it is excessive. The only practical test to apply ... is whether the award falls somewhere within the necessarily uncertain limits of just damages or whether the size of the verdict so shocks the sense of justice as to compel the conclusion that the jury was influenced by partiality, prejudice, mistake or corruption...." *Gaudio v. Griffin Health Services Corp.,* 249 Conn. 523, 550–51, 733 A.2d 197 (1999) (internal citations omitted).

 Defendant argues that the evidence was insufficient here to support any award of compensatory damages, and the verdict should therefore be remitted to zero or, at most, a nominal amount. Defendant points to the fact that each plaintiff's emotional distress award was supported solely by his own testimony, that there was no evidence of psychological conditions or medical treatment, and that the individual plaintiffs had not been humiliated or rejected by their co-workers. The Court disagrees that the evidence here was insufficient to support some compensatory damages award. There is no requirement under Connecticut law that a claim for emotional distress be supported by medical evidence. *See Berry v. Loiseau,* 223 Conn. 786, 811, 614 A.2d 414 (1992). Plaintiffs here testified credibly to their feelings of hurt, shock, disorientation, embarrassment and the distress they suffered at the loss of their careers after such a lengthy tenure at Pratt. As plaintiffs' evidence was adequate to support some award, the Court must next determine whether the jury's verdict was excessive.

Connecticut courts have remitted emotional distress awards where there was no proof of permanent injury and the damages award was disproportionate to the loss sustained; *see Buckman v. People Express, Inc.,* 205 Conn. 166, 175, 530 A.2d 596 (1987) (remitting $50,000 to $15,000 where plaintiff failed to present proof of permanent injury); where the plaintiff was substantially compensated under other counts, and only sought counseling for six sessions to treat her emotional distress, *see Crane v. Trinity College,* No. CV 950555013S, 1999 WL 1315017 (Conn.Super., Dec.27, 1999) (remitting $2 million gender discrimination award to $50,000); and in a failure to hire case, where there was no evidence of physical or psychological injury, and the plaintiff had found a new job which he enjoyed. *Ragin v. Laidlaw,* Docket No. 97cv0024, 1999 WL 977603, *5 (D.Conn., Oct. 4, 1999) (remitting jury verdict of $250,000 in FEPA case to $150,000 as "absolute maximum" that could be awarded in case). In contrast, the Connecticut Supreme Court affirmed an emotional distress award of $50,000 in *Berry* where the plaintiff supported his claim with testimony from a psychiatrist that he suffered from post-traumatic stress disorder as a result of being physically assaulted by his supervisor. 223 Conn. at 810, 614 A.2d 414. Further, in *Oakes* the state Supreme Court affirmed the jury's $97,000 emotional distress award, where the plaintiff's doctor diagnosed him as suffering from depression and prescribed Valium, where plaintiff described a recurrent stomach ailment requiring stomach medication because of his stress, and where plaintiff had engaged in a "futile four year search for employment" that led to further feelings of humiliation and rejection. 219 Conn. at 13, 591 A.2d 1261.

In determining the proper amount of a compensatory damages award under other state and federal statutes, courts have looked to a number of factors, including: whether plaintiff submitted evidence regarding the duration, severity, and consequences of the emotional harm suffered, *Ortiz–Del Valle v. National Basketball Ass'n*, 42 F.Supp.2d 334, 342 (S.D.N.Y. 1999) (remitting $750,000 award under Title VII and New York state statute to $20,000); and the detail to which plaintiff testifies regarding the magnitude and duration of his emotional distress, *McIntosh v. Irving Trust Co.*, 887 F.Supp. 662, 664 (S.D.N.Y.1995) (remitting $219,000 Title VII and § 1981 award to $20,000).

In *Miner v. City of Glens Falls*, 999 F.2d 655 (2d Cir.1993), the district court determined that a $12,000 award in a Section 1983 suit was not excessive, where the plaintiff police officer, who was denied due process and forced to retire, suffered humiliation as he applied for public assistance, was forced to sell his new home, and experienced deteriorating relations with his family. *Id.* at 662–3. Similarly, the trial court found sufficient support for a $100,000 compensatory damages award in a national origin discrimination claim, where the plaintiff tried to kill himself but was saved by his son, and then spent two weeks under "suicide watch" at the hospital. *Marfia v. T.C. Ziraat Bankasi*, 903 F.Supp. 463 (S.D.N.Y.1995), *vacated on other grounds*, 100 F.3d 243 (2d Cir.1996). Although these cases were brought under Title VII or Section 1983, and thus were governed by the federal standards for sufficiency of the evidence and excessiveness of the verdict, their conclusions provide some guidance to the Court. *See Levy v. Commission on Human Rights and Opportunities*, 236 Conn. 96, 103, 671 A.2d 349 (1996) (violations of FEPA are analyzed in the same manner as federal law).

The evidence in this case shows neither extreme trauma nor permanent injury. Mr. Schanzer testified about his shock at being laid off, that losing his career at Pratt felt like losing his "security blanket," Tr. at 89, and that his termination and forced idleness made him feel useless. Some work friendships and his participation in a volleyball league with Pratt employees had to cease because they were "too uncomfortable for me to continue." While Mr. Schanzer had to persuade his wife that he had been terminated by showing her the cardboard box of his personal effects, and he testified that his relationships were changing "both at work and at home," he did not provide details or indicate that his termination caused problems to his family life. Nor did Mr. Schanzer have any physical manifestations of his emotional distress, or seek counseling or medical help. That the two and a half years after his layoff were difficult economic times for Mr. Schanzer is significant, as he found only temporary positions without benefits, and had to pay to provide health insurance for his family. Tr. at 93–94. The jury awarded $135,000 in economic damages, however, and found that both plaintiffs were entitled to liquidated damages due to the defendant's wilful violation of the ADEA. This economic and punitive award of $270,000 will do much to restore Mr. Schanzer's economic stability.

As to Mr. Madison, he testified that the loss of his job felt like a kick in the stomach. Tr. at 193. He testified credibly that the shock of being laid off after 30 years and being forced to tell his wife, his children, and his 80–year old parents was very hurtful to him. Tr. at 194. His family relationships were injured by his termination, in that he and his wife could no longer afford to talk on the phone long-distance to their daughter on a regular basis, and he could not help his son with the expenses for his upcoming marriage when he had previously promised to do so. Tr. at 196. He was unable to secure a full-time position for a year after the layoff, and then was "out-sourced" out of that job as well. Tr. at 233. He finally found employment with the state of Massachusetts approximately two years and seven

months after his termination, at a substantially reduced salary.

The plaintiffs' shock and humiliation at losing long-time employment that they had believed was so secure, compounded by vague feelings of age victimization and the ensuing economic difficulties, are cognizable as injuries, but the only evidence regarding the nature or degree of the emotional distress they suffered was their own subjective testimony. While under Connecticut law, damages for emotional distress may be awarded based solely on a plaintiff's testimony regarding his emotional suffering, even without corroborating medical treatment or expert testimony, *see Berry*, 223 Conn. at 807, 614 A.2d 414 (1992), the award in this case was vastly disproportionate to the short-term, non-permanent injury about which the plaintiffs testified. *See id.*, 223 at 807, 614 A.2d 414 ($50,000 emotional distress award not grossly excessive where plaintiff suffered sleep disturbances and from post-traumatic stress syndrome). There was no evidence of workplace mistreatment or humiliation. They were laid off, not terminated for individual performance deficiencies. No somatic manifestations of distress or behavioral changes were described, and there was no evidence of serious or traumatic consequences or impact on the plaintiffs' family or personal relationships. The plaintiffs were unemployed or underemployed for six to nine months, thus prolonging their feelings of hurt, embarrassment and loss which were undoubtedly aggravated to some degree by former co-workers' gradual disengagement from some social activities with them. However, the testimony did not describe social isolation or rejection which eliminated each plaintiff's support network, or significant emotional consequences beyond the short term. Finally, the loss of the feeling of security and comfort of employment at Pratt described by each of these two men must be viewed in the context of their inevitable knowledge of Pratt's other downsizing and consolidation.

The plaintiffs were very credible witnesses, and no doubt were made more sympathetic by their lengthy tenure and loyal service at Pratt, such that the jury could intuitively empathize with their feelings of unfairness and the difficulties facing such long-term employees when they re-enter the job market, but such circumstances do not substitute for evidence of emotional consequences in each individual case. Although both plaintiffs were employed by Pratt for significantly longer than the plaintiffs in *Berry* (three years) and *Oakes* (eleven years), and there are factors weighing in favor of some compensatory damages award, remittitur of the jury's verdict in this case is clearly appropriate. Because of the size of the amount and the limited testimony in support, it is clear to the Court that the jury likely included in its award sympathy for the plaintiffs, and/or outrage at Pratt's process and attempt to insulate its liability by utilizing no written documents and destroying all notes. Sympathy and even empathy for the plaintiffs cannot substitute for a careful analysis of the evidence in support of an emotional distress award, *see Nairn v. Nat'l R.R. Passenger Corp.*, 837 F.2d 565, 568 (2d Cir.1988), and the jury's feelings of indignation found proper expression in their finding of wilfulness, and thus should not be an element of a compensatory damages award.

After consideration of the evidence here, and a survey of the cases addressing the excessiveness of jury awards in discrimination cases, the Court is persuaded that the absolute maximum amount that would be permitted to stand and not shock the judicial conscience as a compensatory damage award for plaintiffs is $40,000 for Mr. Schanzer and $45,000 for Mr. Madison. These amounts approach, but do not reach, the level of excessive. *See Earl v. Bouchard Transp.*, 917 F.2d 1320, 1330 (2d Cir.1990) (district courts must "remit the jury's award only to the maximum amount that would be upheld by the district court as not excessive."). *See also Wade v.*

**220**

*Orange County Sheriff's Office,* 844 F.2d 951 (2d Cir.1988) (affirming compensatory damage award of $50,000 for discrimination in employment on basis of race); *Trivedi v. Cooper,* 1996 WL 724743 (S.D.N.Y. Dec.17, 1996) (reducing compensatory damage award of $700,000 to $50,000 in 42 U.S.C. § 1981 case alleging discrimination and retaliation); *Perdue v. City University of New York,* 13 F.Supp.2d 326, 337 (E.D.N.Y.1998) (holding that jury's award of $85,000 in compensatory damages "falls within a reasonable range").

## V. CONCLUSION

Defendant's Renewed Motion for Judgment as a Matter of Law [doc. # 86] is DENIED. Defendant's Motion for a New Trial or, in the Alternative, Remittitur [doc. # 84] is DENIED, conditioned upon plaintiffs' acceptance of the remitted award of $40,000 for plaintiff Schanzer and $45,000 for plaintiff Madison in compensatory damages.

IT IS SO ORDERED.