William P. SHANNON, Plaintiff,

v.

FIREMAN'S FUND INSURANCE COMPANY, Defendant.

No. 00 CIV. 1528(SAS).

United States District Court, S.D. New York.

June 7, 2001.

Michael P. Graff, Michael Siskin, Kurzman Karelsen & Frank, LLP., New York City, for Plaintiff.

Lawrence Piekes, Wiggin & Dana, Stanford, CT, for Defendant.

### OPINION AND ORDER

SCHEINDLIN, District Judge.

Plaintiff, William P. Shannon, brought this action pursuant to the New York State Human Rights Law ("NYHRL"), N.Y. Exec. Law § 296, and the New York City Human Rights Law (the "City law"), N.Y.C. Admin. Code § 8–107, alleging that the defendant, Fireman's Fund Insurance Company ("Fireman's Fund"), unlawfully terminated him because of his age.[1] The case was tried before a jury and on December 22, 2000 the jury returned a verdict in favor of Shannon, awarding him $80,000.00 as compensation for emotional suffering caused by the unlawful termination.[2]

Fireman's Fund now moves for judgment as a matter of law pursuant to Rule 50(b) of the Federal Rules of Civil Procedure, a new trial pursuant to Rule 59 of the Federal Rules of Civil Procedure, or, in the alternative, remittitur of the jury's compensatory damage award.[3] Shannon, in turn, moves for an award of attorneys' fees and other reasonable costs. For the reasons set forth below (1) Fireman's Fund's motion for judgment as a matter of law is denied; (2) Fireman's Fund's motion for a new trial is denied; (3) Fireman's Fund's motion for remittitur of the jury award is granted; and (4) Shannon's motion for attorneys' fees and costs is granted in part and denied in part.

## I. BACKGROUND

### A. Factual Summary

Shannon was hired as a Senior Inland Marine Underwriter by William H. McGee & Co., Inc. ("McGee") in January 1980. In late 1996 or early 1997, the inland marine, commercial property, and special risk departments of McGee were consolidated to form the Inland Marine/Property Unit (the "Unit"). See Tr. at 626–27. Edward Helfers and Lisa Uzzo took charge of the Unit in January 1997 and promoted Shannon to Head Office Underwriter, assigning him primary responsibility over McGee's Midwest territory.[4] See id. at 482–83, 626–27. Other Head Office Underwriters in the Unit included Louis Elias, Erica Mills and Stephanie Reneri. See id. at 482–83, 522–23. Additional underwriters in the Unit included Joseph McKeefry, responsible for catastrophe management, and Frederick Fisher and Donna Campbell, responsible for a package book of property and casual-

---

1. Jurisdiction is based on diversity of citizenship pursuant to 28 U.S.C. § 1332.

2. References to the trial transcript ("Tr.") are made throughout this Opinion.

3. Remittitur "is the process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial." *Shu–Tao Lin v. McDonnell Douglas Corp.*, 742 F.2d 45, 49 (2d Cir.1984); *see also Kirsch v.*

*Fleet St., Ltd.*, 148 F.3d 149, 165 (2d Cir. 1998).

4. Edward Helfers is currently the Vice–President and Underwriting Director for the Inland/Marine Property Unit. *See* Tr. at 626. Lisa Uzzo is the Assistant Vice President for the Inland/Marine Property Unit. *See id.* at 475–76.

ty business referred to as the CML product line. *See id.* at 104, 106, 603–07, 637–38; *see also* Plaintiff's Exhibit ("Pl.Ex.") 48.

On April 9, 1999, Fireman's Fund acquired McGee. At the time of the acquisition, a transition team was assembled to "find a way to quickly integrate both the McGee and the Fireman's Fund marine department[s] into one cohesive unit . . . ." Tr. at 589. The transition team sought to restructure the merged company so that it would have the flexibility to adapt to the changing insurance environment. *See id.* To do so, the company decided to adopt a regional approach to underwriting, increasing the authority of the underwriters in the regional and branch offices by allowing them to sign-off on risks without the approval of the home office. *See id.* at 591–92. As a result, the Head Office Underwriters were given less responsibility. In accordance with this new approach and after numerous discussions with Mike Miller, Executive Vice–President and Chief Operating Officer for the Marine Profit Center,[5] Helfers decided that two of the Head Office Underwriter positions in the Unit would be eliminated. *See id.* at 131–32. After deciding who would be let go, Helfers received an e-mail on August 26, 1999, from Paul Cocja, a human resources employee, asking him to prepare a staffing analysis—a brief summary explaining the reasons for any staffing decisions/recommendations. *See id.* at 55–56; Pl.Ex. 47. Where several employees were eligible to be cut, the staffing analysis was to address each employee's skills, performance approval, interviews, profile, and future potential. *See* Tr. at 58–59; Pl.Ex. 47. The next day Helfers completed his staffing analysis, indicating that Shannon would be let go because

Bill has an extensive background in inland . . . . Inland is the skill set which is prevalent in the new organization, the area for head office assistance and training will be related property . . . . Louis, Stephanie and Erica have property backgrounds . . . . Stephanie has the greatest future potential with the organization to be redeployed into the field at some junction . . . . Erica has experience in training which will be required going forward.

Pl.Ex. 48.

In September 1999, Shannon, at age sixty-two, as well as Elias, age fifty-four, were fired as part of a reduction-in-force ("RIF") which resulted in the termination of eighty-seven company employees. Both Reneri and Mills, ages thirty-two and forty-four, respectively, were retained. At trial Shannon alleged that his age was a motivating and determining factor in Fireman's Fund's decision to terminate him. The jury apparently agreed.

## B. Procedural History

Although Shannon originally filed this action in state court, Fireman's Fund removed the action to federal court on February 28, 2000. Prior to trial, the parties stipulated that Shannon had established a prima facie case of age discrimination under the NYHRL and the City law and thus the only issues to be tried were whether Fireman's Fund's articulated reasons for the termination were a pretext for unlawful discrimination, and if so, what damages has Shannon proven. *See* Joint Pretrial Order at 3. The parties further agreed that in the event Shannon prevailed at trial, the Court would determine the amount of back and/or front pay to which he is entitled. The trial began on December 18, 2000. At the close of Shannon's case Fireman's Fund moved for judgment as a matter of

---

5. Miller was President of McGee prior to the merger.

law with respect to liability as well as Shannon's claim for punitive damages. *See* Tr. at 496–507. The Court denied the motion as to liability but granted it with respect to punitive damages. *See id.* On December 22, 2000, the jury found in favor of Shannon and awarded him $80,000.00 as compensation for emotional suffering caused by the unlawful termination. In a decision dated March 1, 2001, the Court found that Shannon was entitled to $240,285.90 in back and front pay. *See Shannon v. Fireman's Fund Ins. Co.,* 136 F.Supp.2d 225 (S.D.N.Y.2001). Judgment was entered on March 20, 2001, and by stipulation dated March 21, 2001, the parties agreed to stay the execution of the judgment pending the disposition of Fireman's Fund's post-trial motions.

## II. DISCUSSION [6]

### A. Motion for Judgment as a Matter of Law [7]

#### 1. Legal Standard

 A court may render judgment as a matter of law when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue . . . ." Fed.R.Civ.P. 50(a)(1); *see also Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 149, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). The standard for granting judgment as a matter of law "mirrors" the standard for summary judgment such that the "inquiry under each is the same." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250–51, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see Reeves,* 530 U.S. at 150, 120 S.Ct. 2097. In ruling on such a motion, the trial court is required to

> consider the evidence in the light most favorable to the party against whom the motion was made and to give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence. The court cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury.

*Tolbert v. Queens Coll.,* 242 F.3d 58, 70 (2d Cir.2001) (quoting *Smith v. Lightning Bolt Prods., Inc.,* 861 F.2d 363, 367 (2d Cir. 1988) (internal quotations and citation omitted)). In making its determination, a court should

> review all of the evidence in the record [but] it must disregard all evidence favorable to the moving party that the jury is not required to believe . . . . . That is, the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that evidence comes from disinterested witnesses.

*Reeves,* 530 U.S. at 150–151, 120 S.Ct. 2097 (internal quotations and citations omitted); *see also Raniola v. Bratton,* 243 F.3d 610, 616 (2d Cir.2001). Thus, judgment as a

---

6. Although there are differences between the NYHRL, the City law, and the federal Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.,* age discrimination suits brought under the NYHRL and the City law are subject to the same analysis as claims brought under the ADEA. *See Abdu–Brisson v. Delta Air Lines, Inc.,* 239 F.3d 456, 466 (2d Cir.2001); *see also Lightfoot v. Union Carbide Corp.,* 110 F.3d 898, 913 (2d Cir.1997).

7. Rule 50 requires that a party move for judgment as a matter of law prior to the submission of the case to the jury. *See* Fed.R.Civ.P. 50(a)(2). If the motion is denied, it may be renewed within ten days after the entry of judgment. *See* Fed.R.Civ.P. 50(b). Fireman's Fund complied with these requirements and therefore the motion is properly filed.

matter of law should not be granted unless "(1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [it]." *DiSanto v. McGraw–Hill, Inc.,* 220 F.3d 61, 64 (2d Cir.2000) (internal quotations and citation omitted); *see also Epstein v. Kalvin–Miller Int'l, Inc.,* 139 F.Supp.2d 469, 474–76 (S.D.N.Y. Apr.17, 2001); *Hiller v. County of Suffolk,* 199 F.R.D. 101, 103 (E.D.N.Y.2001).

### 2. Pretext

■ As noted above, the parties stipulated that Shannon had established a prima facie case of age discrimination under the NYHRL and the City law and thus the primary issue to be tried was whether Fireman's Fund's articulated reasons for the termination were a pretext for unlawful discrimination.[8] Once a plaintiff's prima facie case is proven and the employer's non-discriminatory explanation has been given, "the *McDonnell Douglas* presumptions disappear from the case, and the governing standard is simply whether the evidence, taken as a whole, is sufficient to support a reasonable inference that prohibited discrimination occurred." *James v. New York Racing Assoc.,* 233 F.3d 149, 156 (2d Cir.2000). At trial, Fireman's Fund asserted that Shannon was terminated because (1) his underwriting background was primarily in inland, a skill set prevalent in the merged company; and (2) in comparison with Elias, Reneri and Mills,

he had the least amount of experience in property underwriting, the primary focus of the Unit subsequent to the merger. Fireman's Fund argues that Shannon failed to prove that its proffered reasons for termination were a pretext for unlawful discrimination.

Similar to many plaintiffs who bring discrimination suits, Shannon could not produce direct evidence of an improper discriminatory bias. *See Carlton v. Mystic Transp., Inc.,* 202 F.3d 129, 135 (2d Cir.), *cert. denied,* 530 U.S. 1261, 120 S.Ct. 2718, 147 L.Ed.2d 983 (2000) ("[A]n employer who discriminates against its employee is unlikely to leave a well-marked trail, such as making a notation to that effect in the employee's personnel file."). However, direct evidence of discrimination is not necessary to prevail in such an action. *See Luciano v. Olsten Corp.,* 110 F.3d 210, 215 (2d Cir.1997) ("Direct evidence is not necessary, and a plaintiff charging discrimination against an employer is usually constrained to rely on the cumulative weight of circumstantial evidence."). In *Reeves,* the Supreme Court granted *certiorari* "to resolve a conflict among the Courts of Appeals as to whether a plaintiff's prima facie case of discrimination, combined with sufficient evidence for a reasonable factfinder to reject the employer's non-discriminatory explanation for its decision, is adequate to sustain a finding of liability for intentional discrimination." 530 U.S. at 140, 120 S.Ct. 2097. *Reeves* concluded that

> a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false,

---

**8.** A plaintiff's burden of establishing a prima facie case is de minimis. *See Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 203–04 (2d Cir. 1995). "To establish a prima facie case of age discrimination, a plaintiff must show four things: (1) he is a member of the protected class; (2) he is qualified for his position; (3) he has suffered an adverse employment action; and (4) the circumstances surrounding that action give rise to an inference of age discrimination." *Abdu–Brisson,* 239 F.3d at 466–67 (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)).

*may* permit the trier of fact to conclude that the employer unlawfully discriminated. This is not to say that such a showing by the plaintiff will always be adequate to sustain a jury's finding of liability. Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory.

530 U.S. at 148, 120 S.Ct. 2097 (emphasis added). This language makes clear that a plaintiff's prima facie case combined with evidence demonstrating the employer's proffered reason is false will, in most circumstances, be sufficient to sustain a verdict of discrimination. However, the Second Circuit has stated that *Reeves* "mandates a case-by-case approach, with a court examining the entire record to determine whether the plaintiff could satisfy his 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'" *Schnabel v. Abramson,* 232 F.3d 83, 90 (2d Cir.2000) (quoting *Reeves,* 530 U.S. at 143, 120 S.Ct. 2097 (internal quotations and citation omitted)); *see also Slattery v. Swiss Reinsurance America Corp.,* 248 F.3d 87, 93–94 (2d Cir.2001) ("While the Supreme Court has indicated that only occasionally will a prima facie case plus pretext fall short of the burden a plaintiff carries to reach a jury on the ultimate question of discrimination, it has also made clear that such occasions do exist."). In making its decision a court should consider a number of factors, including "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and

any other evidence that supports [or undermines] the employer's case and that properly may be considered on a motion for judgment as a matter of law." *Reeves,* 530 U.S. at 149–50, 120 S.Ct. 2097. Viewing the record in a light most favorable to Shannon, I find the evidence sufficient to support the jury's finding that Fireman's Fund engaged in unlawful discrimination.

### 3. The Evidence

### a. Shannon's Underwriting Experience

Although Fireman's Fund argues that Shannon's experience was primarily in inland, there was sufficient evidence for the jury to infer that Shannon had an extensive background in underwriting property as well. Shannon testified that prior to coming to McGee he had approximately seven years experience underwriting property policies at Marsh & McLennan and AIG. *See* Tr. at 143. In addition, Shannon underwrote several property related policies while at McGee, including: (1) the Schlumberger policy;[9] (2) coal mining risks arising from McGee's Columbus office; and (3) builder's risks on existing buildings. *See id.* at 147–48, 153. David Matana, Shannon's supervisor at McGee from September 1986 to January 1997, testified that Shannon underwrote numerous property related risks and was "competent to handle the risks that were presented." *Id.* at 297. From the time Shannon was appointed Head Office Underwriter until the time he was terminated, Shannon was authorized to consider, review, approve and sign insurance policies up to $10,000,000.00, including those related to property—the highest underwriting authority in the Unit. During that

---

**9.** Although the Schlumberger account was coded as an inland policy, it contained property risks as well. *See* Tr. at 307–08.

time, Shannon was underwriting and approving a mix of both inland and property related. policies.[10] Further, from September 1999 through March 1999, while Reneri was absent due to maternity leave, Shannon assumed responsibility over her property-intensive territory. *See id.* at 177–78. Shannon handled the added responsibility without complaint or criticism. *See id.* at 68. On March 17, 1999, Shannon received a highly satisfactory performance appraisal from Uzzo, which outlined McGee's developmental plans for Shannon as follows:

> To utilize Bill's seasoned and experienced skills in property/inland and to assist in the development of staff. Bill has and will continue to develop new products/procedures to update our manuals.

Pl.Ex. 40.

While Fireman's Fund argues that both Reneri and Uzzo were better suited than Shannon to provide the type of head office support required in the aftermath of the merger, Helfers admitted that there is nothing in any of Shannon's performance appraisals indicating that he needs improvement in the "property area." *See* Tr. at 73–74. All of Shannon's appraisals were highly favorable. Helfers stated that he had not reviewed the appraisals prior to selecting Shannon for termination and his decision was based on his knowledge of the employees' skills and abilities. *See id.* at 128–29.

▮ While a court must respect an employer's decision to choose among qualified candidates, it is well recognized that an employer's disregard or misjudgment of a plaintiff's job qualifications may undermine the credibility of an employer's stated justification for an employment decision. *See*

*Byrnie v. Town of Cromwell, Bd. of Education,* 243 F.3d 93, 103 (2d Cir.2001); *Fischbach v. D.C. Dep't of Corr.,* 86 F.3d 1180, 1183 (D.C.Cir.1996); *see also Alexander v. Fulton County, Ga.,* 207 F.3d 1303, 1340 (11th Cir.), *reh'g and reh'g in banc denied,* 218 F.3d 749 (11th Cir.2000) (noting that "evidence showing an employer hired a less qualified applicant over the plaintiff may be probative of whether the employer's proffered reason for not promoting plaintiff was pretextual"). Clearly, the jury could infer from both the evidence in the record and its assessment of the credibility of the witnesses that Shannon was equal or perhaps more qualified than either Reneri or Mills. While this inference standing alone may not be enough to prove pretext, in combination with the other evidence discussed below, it certainly has probative value. *See Byrnie,* 243 F.3d at 103.

### b. Fireman's Fund's False Statements to the New York State Division of Human Rights ("NYSDHR")

After being terminated Shannon filed a charge with the NYSDHR. In response to the charge, Fireman's Fund submitted a position statement to the NYSDHR. *See* Pl.Ex. 61. To summarize, Fireman's Fund stated that Shannon was terminated because

> he didn't have experience in any of the three critical areas. [Shannon] did not have experience conducting training or audits; nor did he have experience underwriting real property.

*See id.* at 5. Fireman's Fund now admits that these reasons were not entirely accurate.

---

**10.** Reneri testified that Shannon was performing the same duties with respect to inland and property related policies as the other underwriters in the Unit. *See* Tr. at 376–77.

During the trial, both Helfers and Uzzo testified that Shannon had experience underwriting real property. *See* Tr. at 100, 489–90. Helfers further admitted that any lack of experience in training and audits was not a factor in selecting Shannon for termination.[11] *See id.* at 91, 97. It is undisputed that Helfers met with Elizabeth Franklin, in-house counsel for Fireman's Fund and the drafter of the response, to discuss Shannon's claim. *See id.* at 94–95. Franklin provided Helfers with a draft of the letter prior to its submission to the NYSDHR, yet no corrections or suggestions were made. *See id.*

Numerous courts have stated that "a plaintiff may establish pretext and thereby successfully oppose summary judgment [or judgment as a matter of law] ... by demonstrat[ing] weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, non-discriminatory reason for its action." *Cruse v. G&J USA Publ'g*, 96 F.Supp.2d 320, 329 (S.D.N.Y.2000); *see EEOC v. Ethan Allen, Inc.*, 44 F.3d 116, 120 (2d Cir.1994); *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 38–39 (2d Cir.1994); *Ramos v. Marriott Int'l, Inc.*, 134 F.Supp.2d 328, 343 (S.D.N.Y.2001). Although Fireman's Fund argues that at most, the discrepancies in its explanations for Shannon' termination create a weak issue of fact as to whether the Fireman's Fund's proffered reason for termination was untrue, this evidence may be used by the jury to infer pretext. *See*

*Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 97–98 (2d Cir.1999) (although the Circuit ultimately held that the district court did not err in granting judgment as a matter of law, it recognized that varying justifications are generally enough to suggest pretext and "the job of reconciling [such variations] belongs to the factfinder and is not appropriate for resolution as a matter of law").

### c. Simple Statistics [12]

 It is well settled that a plaintiff alleging disparate treatment may introduce statistics as circumstantial evidence of discrimination. *See, e.g., Stratton v. Dep't for the Aging*, 132 F.3d 869, 877 (2d Cir.1997); *Hollander v. American Cyanamid Co.*, 172 F.3d 192, 202 (2d Cir.), *cert. denied*, 528 U.S. 965, 120 S.Ct. 399, 145 L.Ed.2d 311 (1999); *Hudson v. Int'l Bus. Mach. Corp.*, 620 F.2d 351, 355 (2d Cir. 1980); *see also Sweeney v. Bd. of Trustees of Keene State Coll.*, 604 F.2d 106, 113 & n. 11 (1st Cir.1979) (statistics add color and may be helpful to an individual claim of discrimination). Because a disparate treatment claim looks at how an employee is treated compared to his similarly situated co-workers, "statistical analyses that compare coworkers who competed directly against each other to receive a benefit, here selection for retention, are appropriate." [13] *Smith v. Xerox Corp.*, 196 F.3d 358, 370 (2d Cir.1999).

---

**11.** In fact, although Fireman's Fund's response states that both Reneri and Mills conducted field audits, they each conducted only one audit. *See* Tr. at 101. Helfers further testified that either Shannon or Elias, had they remained employed, would have been in line to conduct the next audit. *See id.* at 101–02.

**12.** During the trial Shannon also presented evidence showing the impact of the RIF on those employees over the age of sixty. *See* Tr. at 411–415. Fireman's Fund asserts that it

was an error for the Court to allow such statistics and, accordingly, a new trial is warranted. Fireman's Fund's contention is discussed in section II.B.2.b, *infra*.

**13.** In order for employees to be "similarly situated," they "must have been subject to the same standards governing performance evaluation and discipline, and must have engaged in conduct similar to the plaintiff's ...." *Norville*, 196 F.3d at 96 (internal quotations and citation omitted); *see also Bennett v. Watson*

Shannon introduced evidence that the five oldest underwriters in the Unit were let go: Joseph McKeefry, age sixty-three; Frederick Fisher, age sixty-three; Donna Campbell, age forty-nine; and William Shannon and Louis Elias, ages sixty-two and fifty-four, respectively. *See* Tr. at 67, 385, 400; Pl.Ex. 48. On the other hand, Reneri and Mills, the underwriters who were retained, were ages thirty-two and forty-four, respectively. While Fireman's Fund asserts that this simple statistical data has no probative value, if the jury determined that Shannon was in fact equal to or more qualified than either Reneri or Mills, the jury could further infer from these statistics that Fireman's Fund's proffered reason for termination was a pretext for unlawful discrimination. *See Norville,* 196 F.3d at 95 (finding that a "plaintiff may support an inference of race discrimination by demonstrating that similarly situated employees of a different race were treated more favorably."); *Campbell v. Alliance Nat'l Inc.,* 107 F.Supp.2d 234, 250–51 (S.D.N.Y.2000) ("Plaintiff may ... establish pretext by demonstrating that similarly situated employees were treated differently than she was."); *see also Stratton,* 132 F.3d at 877 (upholding the introduction of simple statistics in a disparate treatment case where they were part of the overall proof and the jury was instructed not to give them any undue reliance).

### d. The Staffing Analysis and "Future Potential" Criteria

The August 26, 1999 e-mail from Cocja to Helfers directed him to prepare a staffing analysis, which "should include [an explanation of each] employee's skills, performance approval, interviews, profile, [and] future potential." *See* Tr. at 55–59; Pl.Ex. 47. One day later, *after* the decision to

terminate Shannon had already been made, Helfers completed his staffing analysis. *See* Pl.Ex. 48. As noted earlier, Helfers did not review Shannon's performance appraisals prior to selecting him for termination or conduct an interview. *See* Tr. at 128–29. According to Helfers, his decision was based solely on his knowledge of the employees' skills and abilities. *See id.*

▆ "While [a court should] not second-guess an employer's hiring [or termination] standards, the reasons for its employment decision, including its alleged reliance on such standards, are subject to scrutiny under [the law], and '[d]epartures from procedural regularity,' for example, 'can raise a question as to the good faith of the process where the departure may reasonably affect the decision.'" *Stern v. Trustees of Columbia Univ. in the City of New York,* 131 F.3d 305, 313 (2d Cir.1997) (quoting *Zahorik v. Cornell Univ.,* 729 F.2d 85, 93 (2d Cir.1984)). Although Helfers was directed to consider Shannon's performance appraisals and interviews, he did not. The jury could infer that had he considered these materials his decision may have been different.

With respect to the decision to retain Mills, Helfers stated that "Stephanie has the greatest future potential with the organization to be redeployed in the field at some juncture." Pl.Ex. 48. At trial, Helfers testified that he could not remember Reneri ever expressing an interest in being redeployed in the field. *See* Tr. at 65. Further, while future job potential is something that a company might legitimately consider in an RIF decision, *see Doan v. Seagate Technology, Inc.,* 82 F.3d 974, 978 (10th Cir.1996), the use of "future potential" as a criteria to be considered in

*Wyatt & Co.,* 136 F.Supp.2d 236, 250 (S.D.N.Y.2001). Fireman's Fund does not argue that the underwriters in the Unit were not "similarly situated" to Shannon.

deciding which employees to retain in an RIF, in some circumstances, may be relied upon by the jury to infer pretext for unlawful discrimination. *See Schanzer v. United Technologies Corp.*, 120 F.Supp.2d 200, 210–212 (D.Conn.2000) (finding that the criteria of "future potential" could be suggestive of age discrimination in light of the other evidence presented, such as statistical disparities and evidence tending to undermine the defendant's explanation of its actions).

Fireman's Fund relies primarily on the Seventh Circuit's decision in *Thorn v. Sundstrand*, 207 F.3d 383 (7th Cir.2000), for its position that use of "future potential" as a criteria in deciding who to terminate is both factually and legally insignificant. In *Thorn*, Judge Richard A. Posner observed that "[s]ince younger employees tend to be more mobile than older ones, there is no basis for an inference that employers interested in the long-term potential of an employee prefer young to old." *Id.* at 389. However, in *Thorn*, Judge Posner specifically noted that "without such an inference [plaintiff had] no case . . . ." *See id.* That is not the case here. As in *Schanzer*, Shannon has presented other evidence of pretext—which in combination with Fireman's Fund's use of "future potential" as a criteria for the selection of employees for the RIF may be enough for the jury to infer a discriminatory motive. *See Schanzer*, 120 F.Supp.2d at 211 n. 3 (disagreeing with the premise that an employer's consideration of "longest-term potential" is "always an age neutral factor").

#### b. Totality of the Evidence

 As noted in *Reeves*, when a court decides a motion for judgment as a matter of law it must "review all of the evidence in the record." *Reeves*, 530 U.S. at 150, 120 S.Ct. 2097. "A combination of factors, any of which judged on their own would be much less compelling, [may] provide sufficient evidence to allow a reasonable jury to conclude that [a defendant's] explanation for [the adverse employment action] was a pretext for impermissible discrimination." *Byrnie*, 243 F.3d at 102; *see also Tolbert*, 242 F.3d at 70 ("'An invidious discriminatory purpose may often be inferred from the totality of the relevant facts . . . .'") (quoting *Washington v. Davis*, 426 U.S. 229, 242, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976)). Based upon a review of all of the evidence, I cannot conclude that the jury's findings were the result of sheer surmise and conjecture or that fair minded persons could not have arrived at the same verdict. To the contrary, although the issue is close, the evidence was legally sufficient to sustain the jury's conclusion that Fireman's Fund's proffered reason for Shannon's termination was a pretext for unlawful discrimination. Accordingly, Fireman's Fund's motion for judgment as a matter of law is denied. *See Reeves*, 530 U.S. at 148, 120 S.Ct. 2097 (a "plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated," and is sufficient evidence to "sustain a jury's finding of liability"); *see also Epstein*, 139 F.Supp.2d 469, 476–77.

#### B. Motion for a New Trial

#### 1. Legal Standard

 Although a less stringent standard applies to motions for a new trial, a court may only grant such a motion if it is "convinced 'that the jury has reached a "seriously erroneous result" or that the verdict is . . . against the weight of the evidence.'" *U.S. East Telecomms., Inc., v. U.S. West Communications Servs.*, 38 F.3d 1289, 1301 (2d Cir.1994) (quoting *Mallis v. Bankers Trust Co.*, 717 F.2d 683,

691 (2d Cir.1983)); *see also Purnell v. Lord,* 952 F.2d 679, 686 (2d Cir.1992); *Smith,* 861 F.2d at 370; *Katara v. D.E. Jones Commodities, Inc.,* 835 F.2d 966, 970 (2d Cir.1987). The Second Circuit has articulated the standard as follows:

> The trial judge, exercising a mature judicial discretion, should view the verdict in the overall setting of the trial; consider the character of the evidence and the complexity or simplicity of the legal principles which the jury was bound to apply to the facts; and abstain from interfering with the verdict unless it is quite clear that the jury has reached a seriously erroneous result. The judge's duty is essentially to see that there is no miscarriage of justice. If convinced that there has been then it is [her] duty to set the verdict aside; otherwise not.

*Bevevino v. Saydjari,* 574 F.2d 676, 684 (2d Cir.1978) (quoting 6A J. Moore, *Moore's Federal Practice,* ¶ 59.08[5], at 59–160–59–161 (1973)). However, "unlike a judgment [as a matter of law], a new trial may be granted even if there is substantial evidence to support the jury's verdict." *Song v. Ives Labs., Inc.,* 957 F.2d 1041, 1047 (2d Cir.1992). Nevertheless, "[w]here the resolution of the issues depend[s] on [an] assessment of the credibility of the witnesses, it is proper for the court to refrain from setting aside the verdict and granting a new trial." *Metromedia Co. v. Fugazy,* 983 F.2d 350, 363 (2d Cir.1992). "A court considering a Rule 59 motion for a new trial must bear in mind ... that the court should only grant [such] a motion when the jury's verdict is 'egregious.'" *DLC Mgmt. Corp. v. Town of Hyde Park,* 163 F.3d 124, 134 (2d Cir. 1998) (citation omitted).

### 2. Analysis

Fireman's Fund asserts that a new trial is warranted because (1) the jury's verdict is against the weight of the evidence; and (2) the Court erred in admitting certain statistical evidence. Each of these arguments is addressed in turn.

### a. The Verdict Is Against the Weight of the Evidence

 While the standard for a Rule 59 motion is less stringent than the standard for judgment as a matter of law, a motion for a new trial is "not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a 'second bite at the apple' ...." *Sequa Corp. v. GBJ Corp.,* 156 F.3d 136, 144 (2d Cir.1998) (citation omitted). Based on the evidence presented at trial, the jury was entitled to infer that Fireman's Fund's articulated reasons for termination were a pretext for unlawful discrimination. For the same reasons cited above, I do not find the jury's verdict to be seriously erroneous, a miscarriage of justice, or egregious. "While the Court need not necessarily weigh the evidence in a light most favorable to the non-moving party, disagreement with the verdict alone is insufficient to justify the ordering of a new trial." *Muller v. Costello,* 997 F.Supp. 299, 302 (N.D.N.Y.1998), *aff'd,* 187 F.3d 298 (2d Cir. 1999); *see also Epstein,* 139 F.Supp.2d at 478–79. Accordingly, Fireman's Fund's motion for a new trial on the grounds that the verdict is against the weight of the evidence is denied.

### b. Shannon's Statistical Proffer

 During the testimony of Rita Da Luz, Vice–President of Human Resources for the Commercial Insurance Division, Shannon's counsel introduced a calculation, over Fireman's Fund's objection, indicating that employees over the age of sixty were three times as likely to be let go as part of the RIF than those under age

sixty.[14] *See* Tr. at 409–15. Fireman's Fund contends that the admission of this calculation was an error and fatally tainted the verdict. *See id.* I disagree.

■ As Fireman's Fund correctly points out, to be probative of discrimination, statistics must compare the impact of a particular employment decision or practice on those within the protected group and those outside it. *See, e.g., Criley v. Delta Air Lines, Inc.,* 119 F.3d 102, 105 (2d Cir.1997) (in order to show disparate impact under the ADEA plaintiff must introduce statistics showing a disparate impact on the entire protected group, i.e., workers aged 40 and over). A plaintiff is not allowed to skew the statistics in a manner designed to achieve a favorable result. *See Hollander,* 172 F.3d at 203; *Lowe v. Commack Union Free Sch. Dist.,* 886 F.2d 1364, 1373 (2d Cir.1989).

Here, Shannon compared the impact of the RIF on those employees over the age of sixty to those under sixty. While this statistical proffer would clearly not be admissible under the ADEA—which protects employees over the age of forty—the NYHRL and the City law, under which Shannon brought his claims, do not have an age forty cut-off. After conferring with counsel outside the presence of the jury, the Court allowed Fireman's Fund to rebut Shannon's calculation by introducing the relative non-effect of the RIF on employees over age forty, and immediately charged the jury with the following:

> Now, ladies and gentleman of the jury, I just want to continue, so to speak, with the instruction I gave you maybe a half hour ago when Mr. Graff [Shannon's attorney] first put in some statistics. I said to you that this is not a disparate impact case, that this plaintiff is not

raising a claim that there was a disparate impact on older people, whether it was over 40 or over 50, over 60, or anything else. But I allowed the proof that he offered on the issue of motive, that such evidence might be relevant on that issue. It was going to be up to you decide what the relevance of such evidence would be. But it solely goes to that question.

> So I need to tell you that in the federal law, the cut-off for an age discrimination [case] is age 40. So people are defined as being under 40 or over 40. And if they are over 40, they are in a protected class. But in the state and city law—and this case is brought only under state and city law and not federal law—there is no age cut-off. There is no definition, whether it is over 30, over 40, over 50, or over 60, or over 70. So I have allowed now both sides to offer this statistical proof, with respect to what the company [Fireman's Fund] defined as the relevant group. The company says the relevant group is the 415 people who made up the marine unit. Plaintiff may disagree with that. You will hear from plaintiff during summation. But since the company believed that was the relevant group, it prepared its charts and tables using that group, and now both sides have been able to show you certain statistics that show certain impacts on certain age groups. And you will decide when you deliberate what relevance if any those numbers have.

Tr. at 471–72.

■ A new trial should not be granted "unless [the court] find[s] that the introduction of inadmissible evidence was a clear abuse of discretion and was so clearly

---

**14.** The 415 employee population used for this calculation was a subset of marine employees relied upon by Fireman's Fund in doing its own impact analysis. *See* Tr. at 407; Pl.Ex. 69.

prejudicial to the outcome of the trial that [the court is] 'convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.' " *Luciano,* 110 F.3d at 217 (quoting *Hygh v. Jacobs,* 961 F.2d 359, 365 (2d Cir.1992) (internal quotations and citation omitted)). "We measure prejudice by assessing the error in light of the record as a whole." *Luciano,* 110 F.3d at 217 (citation omitted). While the Court does not agree that Shannon's calculation was inadmissible, even if it was, in light of the immediate jury instruction and the other evidence in the record, its admission was not so clearly prejudicial as to fatally taint the verdict. Thus, Fireman's Fund's motion for a new trial on the grounds that the admission of Shannon's statistical evidence was in error is denied.

### C. Remittitur

"If a district court finds that a verdict is excessive, it may order a new trial, a new trial limited to damages, or, under the practice of remittitur, may condition a denial of a motion for a new trial on the plaintiff's accepting damages in a reduced amount." *Tingley Sys., Inc. v. Norse Sys., Inc.,* 49 F.3d 93, 96 (2d Cir. 1995) (citing *Phelan v. Local 305 of the United Ass'n of Journeymen and Apprentices of the Plumbing & Pipefitting Indus.,* 973 F.2d 1050, 1064 (2d Cir.1992)); *see also Kirsch,* 148 F.3d at 165. A district court must apply New York law to evaluate whether awards in cases decided under New York law are excessive. *See Gasperini v. Center for Humanities, Inc.,* 518 U.S.

415, 437–438, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996). Pursuant to N.Y. C.P.L.R. § 5501(c), a court should reduce an award when it "deviates materially" from reasonable compensation as measured by awards in similar cases. *See* N.Y. C.P.L.R. § 5501(c);[15] *Gasperini,* 518 U.S. at 425, 116 S.Ct. 2211. The "deviates materially" standard is less deferential to jury verdicts than the "shock the conscience" standard applied by the federal courts because "it does not permit a reviewing court to sustain a damage award that is out of line with other awards for similar injuries, even if the amount the jury awarded was not shocking to a court's conscience." *Fowler v. New York Transit Auth.,* No. 96 Civ. 6796, 2001 WL 83228, at *10 (S.D.N.Y. Jan.31, 2001).

Upon his termination Shannon was in a state of shock. *See* Tr. at 192. Shannon testified that since his termination he has experienced anxiety, stress and depression. *See id.* His anxiety and depression was exacerbated by his subsequent unsuccessful job search, which he found humiliating and caused him to lose self-esteem. *See id.* at 192–93. Shannon further testified that his firing has caused him to lose interest in sex and that he has been unable to have sex. *See id.* at 194. His interest in socializing has diminished, he is tired, irritable, and has had trouble sleeping. *See id.* at 195–98. Shannon's wife corroborated most of this testimony, stating that Shannon is quieter than he used to be, experiences sleeplessness, and is more withdrawn. *See id.* at 309–12. As a result of these symptoms, Shannon sought the

---

**15.** N.Y. C.P.L.R. § 5501(c) provides in relevant part:

> In reviewing a money judgment ... in which it is contended that the award is excessive or inadequate and that a new trial should have been granted unless a stipulation is entered to a different award, the appellate division shall determine that an

award is excessive or inadequate if it deviates materially from what would be reasonable compensation.

*Id.* Although section 5501(c) is directed to the appellate divisions, it applies to trial courts as well. *See Gasperini,* 518 U.S. at 425, 116 S.Ct. 2211.

help of his treating physician, Dr. Eugene Gilbaro, in November 1999.[16] *See id.* at 192.

Dr. Gilbaro prescribed Ativan, an anti-anxiety medication. *See id.* at 272. Shannon told Dr. Gilbaro that his symptoms of anxiety and depression were related to his job loss. *See id.* at 273. Dr. Gilbaro never referred Shannon to either a psychiatrist or psychologist from the time of termination up until trial, although he saw him approximately six times. *See id.* at 278, 280–81.

■ In determining whether a jury award is excessive, the district court should review awards in similar cases. *See Scala v. Moore McCormack Lines, Inc.,* 985 F.2d 680, 684 (2d Cir.1993); *see also Fowler,* 2001 WL 83228, at *12; *Tanzini v. Marine Midland Bank, N.A.,* 978 F.Supp. 70, 77 (N.D.N.Y.1997). Fireman's Fund asserts that discrimination cases involving more substantial evidence of emotional suffering than Shannon has presented have resulted in damage awards well below the $80,000.00 awarded in this case. Therefore, Fireman's Fund requests that the award be remitted to $25,000.00.

Courts performing reviews of jury verdicts in discrimination cases have noted that with "so-called 'garden variety' mental anguish claims, . . . awards hover in the range of $5,000 to $30,000." *Bick v. The City of New York,* No. 95 Civ. 8781, 1998 WL 190283, at *25 (S.D.N.Y. Apr.21, 1998); *see also Fowler,* 2001 WL 83228, at *13.[17] In such cases, "the evidence of mental anguish suffered is generally limited to the testimony of the plaintiff, is described in vague or conclusory terms, without pre-senting evidence of the duration, severity or consequences of the condition, and there is minimal or no evidence of medical treatment." *See Fowler,* 2001 WL 83228, at *13; *see also Epstein,* 139 F.Supp.2d at 479–80 ("A 'garden variety' emotional distress claim is one that did not require medical treatment.").

Examples of cases where courts have remitted excessive jury awards in "garden variety" emotional distress claims under the NYHRL include: *Fowler,* 2001 WL 83228, at *11–*15 (the court remitted the jury's award of $50,000.00 to $25,000.00, where plaintiff complained of headaches, tension, emotional stress, anxiety and vomiting to her treating physician, plaintiff's physician prescribed Ativan to help alleviate her symptoms and recommended her for a psychiatric consultation, and plaintiff's physician relied on her representations regarding her condition and the source of her distress); *Kim v. Dial Serv. Int'l, Inc.,* No. 96 Civ. 3327, 1997 WL 458783, at *12–*14 (S.D.N.Y. Aug.11, 1997), *aff'd,* 159 F.3d 1347, 1998 WL 514297 (2d Cir.1998) (reducing $300,000.00 award to $25,000.00 after applying "shock the conscience" standard where the plaintiff testified and his wife corroborated that he felt "gloomy," had lost weight, drank more, lost interest in socializing, took sedatives, and had trouble sleeping); *McIntosh v. Irving Trust Co.,* 887 F.Supp. 662, 664–65, 668–69 (S.D.N.Y.1995) (remitting $219,428.00 compensatory damage award to $20,000.00 where plaintiff testified that he felt humiliated, shocked, and angry, suffered weakness in his legs, and experienced pains in his stomach and chest, but

---

**16.** Shannon has heart disease and was hospitalized for congestive heart failure early in 1998. *See* Tr. at 268–69. At or about that time Dr. Gilbaro, an internist with a specialty in pulmonary medicine and critical care, became Shannon's treating physician. *See id.*

**17.** Because of inflation, an amount that may have been excessive five to ten years ago may be reasonable today. *See Luciano v. Olsten Corp.,* 912 F.Supp. 663, 673 (E.D.N.Y.1996).

where plaintiff "did not testify in any detail with respect to the magnitude or the duration of any mental distress" and "there was no evidence that the plaintiff sought any medical or psychological help except for one visit to a doctor while he was still employed"); *Borja–Fierro v. Girozentrale Vienna Bank,* No. 91 Civ. 8743, 1994 WL 240360, at *3–*4 (S.D.N.Y. May 27, 1994) (reducing a damage award for mental anguish suffered in connection with a retaliatory discharge from $160,000.00 to $15,000.00 where plaintiff went to a psychologist in part because of the discrimination by the defendant and was the only witness to testify to his mental anguish— the court characterized the plaintiff's testimony as "brief" and "not particularly strong").

■ Although this case is comparable to those just cited, evidence that a plaintiff sought medical or psychiatric treatment generally entitles him to greater damages for mental anguish and emotional distress. *See Distefano v. Long Island Rail Road Co.,* No. 96 Civ. 5487, 1999 WL 1704784, at *7 (E.D.N.Y. Dec.21, 1999); *Bick,* 1998 WL 190283, at *25. Recently, in *Greenville Bd. of Fire Comm'rs v. State Div. of Human Rights,* 277 A.D.2d 314, 716 N.Y.2d 685, 686 (2d Dep't 2000), the court reduced a compensatory damage award related to a sex discrimination claim from $100,000.00 to $50,000.00 where the plaintiff testified that she suffered mental anguish resulting in physical manifestations, such as irritable bowel syndrome and amenorrhea, testimony that was corroborated by her treating physician. *See id.* There is no evidence that Shannon's distress resulted in any such physical manifestations. Because an award should not "deviate materially" from awards in similar cases, Fireman's Fund's motion for a remittitur

of the compensatory damages award is granted and the award is hereby reduced to $40,000.00. If Shannon does not agree to this remittitur in writing by June 25, 2001, a new trial on compensatory damages will be granted.

### D. Attorneys' Fees and Costs

Although the NYHRL does not contain a fee shifting provision, section 8–502(f) of the N.Y.C. Admin. Code provides:

> In any civil action commenced pursuant to this section, the court, in its discretion, may award the prevailing party costs and reasonable attorney's fees.

Shannon, as the prevailing party, seeks attorneys' fees in the amount of $356,871.44 and reimbursement for costs totaling $16,380.72. Fireman's Fund argues that Shannon's request is unreasonable and should be reduced.

■ Both the evaluation of reasonable attorneys' fees and the "cutting of fees claimed [to be] proper" lie within the sound discretion of the court. *See McIntyre v. Manhattan Ford, Lincoln–Mercury, Inc.,* 176 Misc.2d 325, 672 N.Y.S.2d 230, 231–32 (N.Y.Sup.1997) (citations omitted); *see also Hensley v. Eckerhart,* 461 U.S. 424, 437, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) (the district court is afforded broad discretion in assessing a reasonable fee award based on the circumstances of the case). The standard used in determining fee awards under section 8–502(f) of the N.Y.C. Admin. Code is the same as that used for fee claims brought under similar federal statutes. *See McIntyre,* 672 N.Y.S.2d at 231–35 (applying the same principles employed in federal civil rights cases to a fee claim under the City law). Accordingly, I begin with the calculation of the "lodestar" amount.[18]

18. Both parties agree that the lodestar calculation is the proper measure by which to evaluate Shannon's request for attorneys' fees.

### 1. Determination of the Lodestar

 Shannon is entitled to the lodestar amount, which is the product of multiplying a reasonable hourly rate times the number of hours reasonably expended by the prevailing attorneys. *See Quaratino v. Tiffany & Co.*, 166 F.3d 422, 425 (2d Cir.1999); *Kirsch*, 148 F.3d at 172; *Gierlinger v. Gleason*, 160 F.3d 858, 876 (2d Cir.1998); *Greenbaum v. Svenska Handelsbanken, N.Y.*, 998 F.Supp. 301, 303 (S.D.N.Y.1998). The party seeking attorneys' fees bears the burden of demonstrating that the claimed rate and number of hours are reasonable. *See Blum v. Stenson*, 465 U.S. 886, 897, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984) ("When ... the applicant for a fee has carried his burden of showing that the claimed rate and number of hours are reasonable, the resulting product is presumed to be the reasonable fee ...."); *Pascuiti v. New York Yankees*, 108 F.Supp.2d 258, 266 (S.D.N.Y.2000); *see also Hensley*, 461 U.S. at 433, 103 S.Ct. 1933 ("The party seeking an award of fees should submit evidence supporting the hours worked and rates claimed.").

#### a. Reasonable Hourly Rates

 In order to be reasonable, "[t]he hourly rate[s] should be 'in line with those [rates] prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.'" *Greenbaum*, 998 F.Supp. at 303 (quoting *Blum*, 465 U.S. at 896 n. 11, 104 S.Ct. 1541). Shannon has proposed lodestar rates of $315/hr for Michael Graff, lead counsel, and $215/hr for Michael Siskin, co-counsel.[19] Defendant asserts that rates of $225/hr and $175/hr are more appropriate. The rates for each attorney are discussed in turn.

#### (1) Michael Graff

 Graff has been in private practice, concentrating mostly in civil litigation, for the past forty years. *See* Affidavit of Michael P. Graff in Support of Motion for an Award of Attorneys' Fees and Expenses ("Graff Aff.") ¶ 4. For four of those years he litigated labor law matters exclusively, and for the last two years his practice has focused almost exclusively on employment discrimination law. *See id.* ¶¶ 4, 5. His law firm, Kurzman Karelsen & Frank, LLP ("KKF"), is a small to medium size firm.[20] In addition to employment discrimination, KKF's litigation practice includes corporate, commercial and real estate disputes, probate matters, personal injury and medical malpractice. *See id.* ¶ 6. Graff's hourly billing rate for clients not retained on a contingent basis is currently $315.00. *See id.* ¶ 8.

This Court recently found that "the range of fees in this District for 'seasoned civil rights litigators' particularly those in small firms, is between $200/hr and 300/hr." *Pascuiti*, 108 F.Supp.2d at 266; *see also Gavin–Mouklas v. Info. Builders, Inc.*, No. 97 Civ. 3085, 1999 WL 728636, at *5–*6 (S.D.N.Y. Sep.17, 1999) (noting that "the acceptable range seems to be between

---

**19.** Shannon's fee application also includes nominal amounts of time for Peter Goodman and Joseph Seminara (partners in Graff's firm), Joanne Lehu and Michael Peterson (associates), and William Hershkowitz (paralegal). In light of the extraordinary amount sought by Shannon, the approximately seven hours spent by these individuals will not be considered. *See Rodriguez v. McLoughlin*, 84 F.Supp.2d 417, 424 (S.D.N.Y.1999) (finding a request for fees by attorneys who spent an hour or less working on a case "unreasonable, as it is unlikely that counsel could have made a meaningful contribution to the case in such a brief period of time.").

**20.** KKF is a twenty-four lawyer firm. *See* Reply Brief in Support of Plaintiff's Application for an Award of Reasonable Attorneys' Fees and Costs at 7 n. 10.

$200 and $300" for "partners at small law firms in New York City"); *Greenbaum,* 998 F.Supp. at 304 ("Review of recent attorneys' fee awards in the Southern District of New York reveals a preponderance of awards at $250/hr for seasoned civil rights litigators."); *Anderson v. City of New York,* 132 F.Supp.2d 239, 243 (S.D.N.Y.2001) (awarding lead counsel with six years civil rights' litigation experience $250/hr). As one court noted, "the rare case discussing an award of even $300/hr involves awards to unusually esteemed and experienced litigators." *Greenbaum,* 998 F.Supp. at 304. Although Graff's experience as a civil rights litigator is limited, he does have forty years of litigation experience. Taking into account the recent decisions in this District as well as my own experience, I find a rate of $280/hr to be reasonable.

#### (2) Michael Siskin [21]

■ Siskin, a litigation associate with KKF, graduated from the University of Minnesota Law School in 1992. *See* Graff Aff. ¶ 8. He was admitted to the California State Bar in 1992, and the New York and New Jersey State Bars in 1998. *See id.* Siskin has devoted most of his practice to commercial litigation. *See id.* For the past two years he has spent a majority of his time litigating age discrimination cases. *See id.*

Recently, in *Knoeffler v. Town of Mamakating,* 126 F.Supp.2d 305, 312–13 (S.D.N.Y.2000), the court found that $200/hr was a reasonable rate for an attorney with seven years experience in civil rights litigation. In another case, *Sowemimo v. D.A.O.R. Sec., Inc.,* No. 97 Civ. 1083, 2000 WL 890229, *3–*4 (S.D.N.Y. June 30, 2000), the court determined that

$200/hr was reasonable for an attorney with seven years experience practicing law in Nigeria, and over six years of experience in the United States devoted to civil rights litigation. Although Siskin was admitted to the California State Bar in 1992, he has only been practicing in New York since 1998. According to Graff's affidavit, for the past two years Siskin's practice has been devoted to age discrimination litigation, yet the affidavit makes no mention of any specific cases in which Siskin has been involved. While Siskin's representation in this matter was more than adequate, in light of his modest experience as a civil rights litigator, a rate of $180/hr is reasonable.

#### b. Reasonable Hours

Shannon's fee application seeks reimbursement for the 647.10 and 372.80 hours Graff and Siskin spent working on this case, respectively. As required by law, Shannon submitted contemporaneous time records for all hours billed. *See Hensley,* 461 U.S. at 433, 103 S.Ct. 1933. Fireman's Fund argues that these hours are excessive, redundant and vague and should be reduced.

■ A court should not reimburse for "excessive, redundant or otherwise unnecessary" hours. *Id.* at 434–35, 103 S.Ct. 1933. If a court determines that the hours claimed are excessive, redundant, or otherwise unnecessary, it "has [the] discretion simply to deduct a reasonable percentage of the number of hours claimed 'as a practical means of trimming fat from a fee application.'" *Kirsch,* 148 F.3d at 173 (quoting *New York Assoc. for Retarded Children v. Carey,* 711 F.2d 1136, 1146 (2d Cir.1983)); *see also Sowemimo,* 2000 WL

---

**21.** Although Siskin did not submit an affidavit attesting to his experience, Graff, as senior partner at KKF and lead counsel, testified to

Siskin's experience and activities related to this case. *See* Graff Aff. ¶ 8.

890229, at *4 (reducing the number of hours by 20% to "[t]o insure that defendants are not penalized by plaintiff's counsel's inadequate recordkeeping or the time plaintiff's counsel wasted on extraneous tasks."); *Skold v. American Int'l Group, Inc.*, No. 96 Civ. 7137, 1999 WL 405539, at *10 (S.D.N.Y. June 18, 1999), *aff'd*, 205 F.3d 1324, 2000 WL 232031 (2d Cir.2000) (reducing the number of hours by 10% to account for vague entries). Based on my review of the materials, my experience, and my supervision of this action, an across-the-board reduction is appropriate here.

 *First,* the 1019.90 hours expended by Shannon's counsel in litigating this case is clearly excessive. Attorneys should not be reimbursed for inefficiencies, duplication or excessive submissions. *See Lunday v. City of Albany*, 42 F.3d 131, 134 (2d Cir.1994) ("The task of determining a fair fee requires a conscientious and detailed inquiry into the validity of the representations that a certain number of hours were usefully and reasonably expended."). Examples of inefficiencies and excessive litigation can be found throughout the time sheets, one example being *over* thirty hours of preparation for a pre-motion conference held on August 23, 2000.[22] Other examples of excessive entries include:

- Spending close to twenty hours preparing for a half-day deposition of DaLuz

- Spending numerous hours drafting and serving a second set of interrogatories and requests to admit that were, for the most part, duplicative and unnecessary

- Excessive hours spent preparing and reviewing the jury charge

*Second,* many of the entries are vague and do not permit a thorough evaluation. For example, the time sheets are replete with references to counsel's "trial preparation", "witness preparation", "legal research", and "office conferences"—most of which do not indicate the nature or subject matter of the work being performed. These types of entries do not enable a court to determine whether the hours are duplicative or excessive and should not be allowed. *See Skold*, 1999 WL 405539, at *10; *see also Dailey v. Societe Generale*, 915 F.Supp. 1315, 1328 (S.D.N.Y.1996), *aff'd in part, vacated in part on other grounds*, 108 F.3d 451 (2d Cir.1997).

*Third,* the billing records for Graff, a senior partner at KKF, show numerous entries for tasks more appropriately handled by younger associates. *See Plummer v. Chemical Bank*, 592 F.Supp. 1168, 1172 (S.D.N.Y.1984) (reducing fee request by one-half because of numerous inefficiencies, including "$175 per hour partners doing work easily and ordinarily performed by junior associates"); *Beech Cinema, Inc. v. Twentieth Century Fox Film Corp.*, 480 F.Supp. 1195, 1197 (S.D.N.Y. 1979), *aff'd*, 622 F.2d 1106 (2d Cir.1980) ("Many of the functions performed by the partners could have been satisfactorily accomplished by associates, with a considerable saving in fees."). For example, Graff's entries include time spent drafting the Complaint, reviewing and drafting discovery requests, preparing statements of fact, legal research for an anticipated summary judgment motion, legal research on the use of statistics in RIF cases, preparation of the pre-trial order, and legal research re-

---

**22.** This Court's rules require a party to submit a three page letter explaining the basis for a proposed motion for summary judgment and further require that the adversary respond in a similar fashion. Shannon's response to Fireman's Fund's letter was ten pages long—three times the page limit mandated by the Court's rules.

lating to the motions in limine as well as the fee application. While the Court recognizes that in some situations a senior attorney may not have the capacity to delegate tasks to younger associates, that was not a problem here.

To insure that Fireman's Fund is not penalized by Shannon's inefficiencies and excessive billing, a 35% across-the-board reduction is appropriate.

### c. Adjustments to the Lodestar

■ Once the lodestar amount is determined, it may be modified based on equitable "considerations that may lead the district court to adjust the fee upward or downward, including the most important factor of the 'results obtained.'" *Hensley*, 461 U.S. at 434, 103 S.Ct. 1933 (noting that most "factors usually are subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate."). Shannon seeks an upward adjustment of 25% on the basis of the results obtained, the contingent nature of the representation, and the undesirability of the case. In turn, Fireman's Fund asserts that the lodestar should be adjusted downward by 15% to account for time spent by plaintiff's counsel on unrelated claims that were abandoned before trial and another 20% due to the limited success achieved by Shannon overall.

### (1) Fee Enhancement

■ Shannon argues that the risk of recovering nothing warrants a fee enhancement. Fireman's Fund asserts that this argument was explicitly rejected by the Supreme Court in *City of Burlington v. Dague*, 505 U.S. 557, 566, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992). While Shannon does not dispute the holding in *Burlington*,

he argues that *Burlington* does not apply to fee applications brought pursuant to the City law. However, whether an enhancement for contingency fee cases is available under the City law need not be decided here. "Fee enhancement is awarded only in exceptional cases, and is done so in light of the difficulty of the case or the excellence of the result achieved." *Greenbaum*, 998 F.Supp. at 306 (citing *Hensley*, 461 U.S. at 435, 103 S.Ct. 1933). While the jury returned a verdict in Shannon's favor on his disparate treatment claim, an overall fee enhancement is not warranted. In light of the early abandonment of Shannon's other claims and the relatively modest award of the jury, plaintiff's counsel has been fully compensated by the amount of fees awarded today.[23]

### (2) Fee Reduction for Unsuccessful Claims

■ In addition to asserting a disparate treatment claim, Shannon's Complaint, originally filed in state court, alleged claims of disparate impact, disability discrimination, and wrongful discharge in violation of Section 510 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001, *et seq.* Following the pre-motion conference held on August 23, 2000, at the Court's suggestion, Shannon dropped all of his claims except disparate treatment.

■ Besides excluding excessive, redundant or otherwise unnecessary hours, a court should also disregard "hours dedicated to severable unsuccessful claims." *Quaratino*, 166 F.3d at 425. On this issue, the Supreme Court has stated:

In some cases a plaintiff may present in one lawsuit distinctly different claims for

---

23. Shannon's argument that an enhancement is warranted because of the undesirability of this case is unavailing. The record does not

indicate that Shannon had any trouble obtaining an attorney.

relief that are based on different facts and legal theories. In such a suit, even where the claims are brought against the same defendants ... counsel's work on one claim will be unrelated to his work on another claim. Accordingly, work on an unsuccessful claim cannot be deemed to have been expended in pursuit of the ultimate result achieved. The congressional intent to limit awards to prevailing parties requires that these unrelated claims be treated as if they had been raised in separate lawsuits, and therefore no fee may be awarded for services on the unsuccessful claim.

*Hensley*, 461 U.S. at 434–35, 103 S.Ct. 1933 (internal quotations and citations omitted). Fees may be awarded for unsuccessful claims when they are "inextricably intertwined" and "involve a common core of facts or are based on related legal theories." *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1183 (2d Cir.1996). Fireman's Fund argues that the claims dropped by Shannon were not "inextricably intertwined" with his prevailing claim of disparate treatment. Accordingly, Fireman's Fund asserts that the time spent on this case prior to the abandonment of these claims should be reduced by 15%.

The commonality of the disparate impact and disparate treatment claims is plain. No decrease in the lodestar is required based on the overlap in these claims. However, a reduction of 10% is appropriate to reflect the abandonment of the disability discrimination and ERISA claims, both of which are separate and distinct from Shannon's disparate treatment claim.[24]

24. The 10% reduction will only be applied to hours spent prior to the abandonment of those claims.

25. Siskin did not spend any time on the unrelated claims.

With respect to Fireman's Fund request for a 20% reduction for limited success overall, Fireman's Fund readily admits that the primary theory advanced by Shannon was disparate treatment age discrimination and all of the trial preparation and trial time was devoted to that claim. Further, although the amount of damages awarded to Shannon was far below what he sought, there is no requirement that a fee be proportionate to the amount of damages awarded. *See Cowan v. Prudential Ins. Co. of America*, 935 F.2d 522, 524–26 (2d Cir.1991); *Knoeffler*, 126 F.Supp.2d at 319. Accordingly, the lodestar amount will not be further reduced.

#### d. Lodestar Total

In accordance with these rulings, the lodestar is recalculated as follows:

**I. Total # of Hours Claimed**

| | | |
|---|---|---|
| Graff | - | 647.10 |
| Siskin | - | 372.80 |

**II. 35% Reduction for Redundant, Vague and Excessive Billing**

| | | |
|---|---|---|
| Graff | - | $647.10 \times .35 = 226.485$ |
| Siskin | - | $372.80\% \ 2A \ .35 = 130.48$ |

**III. 10% Reduction for Unrelated Claims**

| | | |
|---|---|---|
| Graff [25] | - | $168.805\ [26] \times .10 = 16.805$ |

**IV. Total Compensable Hours**

Graff

| | | |
|---|---|---|
| | 647.10 | (total hours claimed) |
| − | 226.485 | (35% reduction) |
| − | 16.805 | (10% reduction) |
| | 403.81 | |

Siskin

| | | |
|---|---|---|
| | 372.80 | (total hours claimed) |
| − | 130.48 | (35% reduction) |
| | 242.32 | |

26. This figure was reached by (1) calculating the total hours billed prior to the abandonment of the other claims, which equaled 259.7, and (2) multiplying this number by .65 to account for the 35% reduction due to excessive, redundant and vague billing.

### V. Adjusted Lodestar Calculation

Graff

| | | | |
|-------|----|--------|------------------------|
| | | 403.81 | (compensable hours) |
| x | $ | 280.00 | (reasonable hourly rate) |
| | $ 113,066.80 | | |

Siskin

| | | | |
|-------|----|--------|------------------------|
| | | 242.32 | (compensable hours) |
| x | $ | 180.00 | (reasonable hourly rate) |
| | $ 43,617.60 | | |

### IV. Total Lodestar Fee

| $ 113,066.80 | (Graff) |
|--------------|----------|
| $ 43,617.60 | (Siskin) |
| $ 156,684.40 | |

### 2. Costs

Shannon seeks an award of costs totaling $16,380.72. The Second Circuit has held that an award of costs should include "those reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients." *LeBlanc–Sternberg v. Fletcher*, 143 F.3d 748, 763 (2d Cir.1998). Thus, costs include not only those costs ordinarily taxable pursuant to 28 U.S.C. § 1920, as implemented by Rule 54(d)(1) of the Federal Rules of Civil Procedure and Local Rule 54.1, but also those "reasonable costs that are ordinarily charged to clients in the legal marketplace." *Anderson*, 132 F.Supp.2d at 245; *see also Kuzma v. Internal Revenue Serv.*, 821 F.2d 930, 933 (2d Cir.1987). With this principle in mind, I now address some of the contested cost items.

#### a. Deposition Transcripts

■ Shannon seeks reimbursement for the $4,827.05 he spent on deposition transcripts. Fireman's Fund asserts that Local Rule 54.1(c)(2) permits recovery only for those depositions used at trial. However, Local Rule 54.1(c)(2) does not expressly limit recovery of costs for deposition transcripts to those used at trial. To the contrary, "i[t] provides that certain depositions—those used at trial or on dispositive substantive motions—are taxable, while certain others—those taken 'solely for discovery' are not." *Anderson*, 132 F.Supp.2d at 246 (citation omitted). Furthermore, "28 U.S.C. § 1920 provides that the cost of a 'transcript necessarily obtained for use in the case' may be taxed." *Id.* at 246 (quoting *United States Football League v. National Football League*, 704 F.Supp. 474, 487 (S.D.N.Y.1989)). Thus, in order to be taxed as costs, "deposition transcripts need not be introduced into evidence at trial . . . ; it suffices that at the time the deposition was taken it was reasonably expected that the transcript would be used for trial preparation." *Anderson*, 132 F.Supp.2d at 246 (internal quotations and citation omitted). Accordingly, "the proper inquiry is whether, at the time the deposition was taken, it appeared to be reasonably necessary." *Id.* (internal quotations and citation omitted).

The only person deposed that did not testify at trial was Jennifer Loucks, an employee at Fireman's Fund, whose deposition related primarily to issues associated with the ERISA claim. Therefore, the costs relating to her deposition are excluded. In addition, Shannon's deposition, the cost of which was covered by Fireman's Fund per agreement between the parties, is also excluded.[27]

#### b. Expert Witness Fee

Shannon also seeks reimbursement for costs relating to Dr. Gilbaro's deposition and appearance at trial totaling $2,900.00. As Fireman's Fund correctly notes, I ruled

---

**27.** The only costs associated with Shannon's deposition included in the fee application relate to a disc and a condensed transcript.

prior to trial that Dr. Gilbaro was Shannon's treating physician, not an expert witness. As such, Shannon's request for fees to Dr. Gilbaro are excluded.

### c. Westlaw Computer Charges

██ It is well established that "computer research is merely a substitute for an attorney's time that is compensable under an application for attorneys' fees and is not a separately taxable cost." *United States v. Merritt–Meridian Constr. Corp.*, 95 F.3d 153, 173 (2d Cir.1996). In lieu of the sizable award of attorneys' fees already granted, an award for such expenses would be duplicative and inappropriate. *See Marisol A. v. Giuliani*, 111 F.Supp.2d 381, 402 (S.D.N.Y.2000) (deducting costs for computerized research from expense request); *see also Scanlon v. Kessler*, 23 F.Supp.2d 413, 418 (S.D.N.Y.1998); *Tanzini*, 978 F.Supp. at 85.

### d. Other Costs

██ Additional costs sought by Shannon include photocopying, filing fees, Federal Express, trial exhibits, and secretarial overtime. All of these costs, with the exception of those for secretarial overtime, *see O'Grady v. Mohawk Finishing Prods., Inc.*, No. 96–CV–1945, 1999 WL 30988, at *8 (N.D.N.Y. Jan. 15, 1999), are "reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients." *LeBlanc–Sternberg*, 143 F.3d at 763 (internal quotations and citation omitted). Accordingly, these costs are compensable.

### e. Total Costs

In sum, Shannon is entitled to costs in the amount of $8,205.12.

## III. CONCLUSION

For the reasons set forth above Fireman's Fund's motions for judgment as a matter of law and for a new trial are denied. Fireman's Fund's motion for a remittitur of the jury award is granted and the award is hereby reduced to $40,000.00. Shannon's motion for attorneys' fees and costs is granted in the amount of $164,889.52.

Further, Shannon is directed to notify this Court, in writing, by June 25, 2001, whether he accepts the remittitur. In the event Shannon does not accept, a new trial on compensatory damages will commence on a date to be set by the Court. If Shannon does accept the remittitur, an amended judgment will be entered in accordance with this Opinion.

SO ORDERED.